**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TONYA MESSER, et al.,                                    Case No. 1:11-cv-246

              Plaintiffs,                                    Weber, J.

    v.                                                      Bowman, M.J.

STATE OF OHIO,
SOUTHERN OHIO
CORRECTIONAL FACILITY, et al.,

              Defendants.


**REPORT AND RECOMMENDATION**

On September 13, 2012, the presiding district judge referred this case to the undersigned magistrate judge for initial consideration and a report and recommendation on the pending motion for summary judgment, pursuant to 28 U.S.C.§636(b)(1)(B). (Doc. 47).  On January 24, 2013, the undersigned held oral argument on the pending motion; Julie Smith and Drew Piersall appeared on behalf of Defendants, and Nina Najjar and James Banks appeared on behalf of Plaintiffs.  For the reasons that follow, I now recommend that the Defendants' motion be granted.

**I. Background**

The following background is derived from the record, with disputed facts construed in Plaintiffs' favor and as noted.[1]

---

[1] This case is presently assigned to trial before U.S. Senior District Judge Herman J. Weber. Judge Weber's Scheduling Order requires parties to provide proposed findings of fact and conclusions of law when filing a motion for summary judgment.  However, when Defendants filed their motion, this case was assigned to U.S. Senior District Judge S. Arthur Spiegel, whose pretrial procedures do not contain this requirement.

**A.  Identification of Parties and Procedural Background**

On April 21, 2011, Plaintiffs Tonya Messer and Anita Triplett, both female correctional officers who are over the age of forty, filed suit against their former employer and related entities, claiming that Defendants discriminated against them on the basis of their age and sex, in violation of both federal and state law.  The named Defendants are:  (1) the Southern Ohio Correctional Facility ("SOCF"); (2) (former) Warden Phillip Kerns; (3) Warden Donald Morgan; and (4) Lieutenant Nathaniel Miller. In their second amended complaint filed on February 16, 2012 (Doc. 15), Plaintiffs allege discrimination and retaliation, claiming that they were subjected to a hostile work environment during their employment as Corrections Officers at SOCF, a maximum security prison in Lucasville, Ohio.

In May of 2009, both Plaintiffs filed formal complaints with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation.  Eventually, on April 1, 2010, both were issued formal Letters of Determination in which OCRC investigators found "probable cause" that Plaintiffs were "sexually harassed and retaliated against for having filed an internal complaint of sexual harassment."  (Doc. 37 at 4, 9).

In November 2009, Plaintiffs filed additional charges that their jobs had been unlawfully selected for elimination in retaliation for their prior pursuit of discrimination charges.  (Doc. 15-3 at 1-2).  On September 9, 2010, both Plaintiffs received additional Letters of Determination, finding "probable cause" for their additional complaints of retaliation.  (Doc. 37 at 13, 15).  The EEOC adopted the findings of the OCRC, and on

2

three separate dates in 2011, issued Plaintiffs formal Notices of their Right to Sue in this Court.  (*See* Doc. 36-1 at ¶6, Docs. 15-2, 15-3).

### B.  Summary of Relevant Facts

Based upon the standards applicable to review of a summary judgment motion, the Court has construed all disputed facts in favor of Plaintiffs.  However, in reviewing the allegations of harassment, discrimination, and retaliation that underlie Plaintiffs' claims, the undersigned finds that most events occurred months or even years before the time frame of the complaint, and are irrelevant.  For example, Defendants assert that Triplett was a "harasser" prior to the time she alleges becoming a victim of discrimination.  However, the evidence against Triplett dates well before the time period of the events that form the basis of Plaintiffs' complaint.  Similarly, the Court does not find relevant Plaintiffs' reference to alleged discrimination from 2006 and 2007.

At oral argument, Plaintiffs' counsel argued that Plaintiffs were subjected to harassment "every day." However, Plaintiffs' second amended complaint alleges that they were subjected to a "hostile work environment" beginning specifically in December 2008,[2] and lasting up until their respective employment with SOCF ended.  Messer, employed at SOCF for more than 15 years, alleges that she was forced to resign on or about June 16, 2010 as a result of her hostile work environment.  Messer worked as "relief staff" in the visiting area until she bid onto the west desk post in the same area in late 2007 or early 2008.  (Messer Deposition, Doc. 23 at 29).  Later, from November

---

[2]*See* Doc. 15, ¶11, alleging that Plaintiffs have been subjected to a hostile work environment and sexual harassment "since in or December, 2008 and up to the present time and into the foreseeable future" [sic].

2009 until her resignation in June 2010, Messer transferred to the "Control 4" post in the "K Corridor."  (*Id.* at 15).

Triplett, employed at SOCF for 23 years, alleges that she was "forced" into retirement on or about December 16, 2010.  (Doc. 36-2, Triplett Affidavit, ¶¶3-4, 10, 14). Triplett was approved for disability retirement effective October 1, 2011 for the conditions of post-traumatic stress disorder and depression.   During most of the relevant time period, from July 2008 until May 3, 2010, Triplett worked at the south desk post of the visiting room area.  (Doc. 25, Triplett Deposition at 15).

During the time frame at issue, Plaintiffs worked primarily in the mail room and visiting departments – two areas of the prison that were connected by a door and considered as one section of the prison facility.  (Messer Depo. at 28).  Four corrections officers were generally assigned to each of the two areas.  (Messer Depo. at 32-34).  A large portion of mail room job duties consists of reviewing pornography, which inmates are permitted to possess, to ensure that the pornography does not contain contraband and is not "overly" explicit.[3]  (Messer Depo. at 150, Triplett Depo. at 131).  Correctional officers assigned to the mailroom, including Triplett, would occasionally discuss the content of those materials.  (Triplett Depo. at 130-132).

Both Triplett and Messer worked in the mail room on Mondays.  On those days, Messer complains that three male officers (Kraft, Salsbury, and Lewis) would pass work onto the two female officers while they played on the computer or read pornographic

---

[3]The Court presumes, paraphrasing the immortal words of Justice Potter Stewart, that the definition of what is "overly" explicit is one of those determinations that corrections officers know when they see.

magazines. (Messer Depo. at 36-37). She testified that Kraft would stare at her in an "intimidating" manner, and would read inmate pornography for hours rather than searching it for contraband. (Messer Depo. at 45-47; Triplett Depo. at 92-93). Triplett complained to Lt. Lewis and Lt. Porter about Kraft's behavior. (*Id.*). She felt Kraft was intimidating because he would kick tubs of mail towards her, and make odd noises and stare. (Triplett Depo. 93-94). Messer and Triplett also spoke to Lt. Miller about their concerns with both Kraft and Ferguson, including complaints about their performance. (Doc. 29, Miller Depo. at 34-37). According to Plaintiffs, Kraft's behavior continued without abatement throughout their employment at SOCF,[4] notwithstanding Plaintiffs' complaints.

On March 3, 2009, Messer met with Warden Kerns, the EEO Chairman Larry Green, and EEO Women's Coordinator Kathy Jones. Messer voiced a number of complaints in that meeting, including but not limited to gender-based complaints that men were not doing their fair share of the work and were spending excess time reading pornography, as well as a complaint that C/O Ferguson was not wearing his alarm. (Messer Depo. at 182-183).

On March 4, 2009, Lt. Miller sent an email to Capt. William Cool, Warden Kerns, then-Deputy Warden Morgan, and Major David Warren, complaining about Messer's meeting with Warden Kerns, and referring to the meeting as "a continuation of Officer Triplett's attempts to erode my authority since I wont [sic] allow her to run the Mail/Visiting Department." (Doc. 37-3 at 1). Referring to Triplett, Miller opines that "she

---

[4]Messer worked with Kraft in visiting from December 2008 until November 2009.

is the root of a majority of the issues in the area" and accuses her of having "power and influence over the 'herd.'" (*Id*.).  The email states Miller's intention to distribute a letter responding "to recent events and the apparent continuing nature of …[Triplett's] attempts to undermine my authority and circumvent the chain of command."  (*Id*.).  Capt. Cool forwarded the email to (then) Union President Gary Shepard, after which it spread like "wildfire" around SOCF.  (Doc. 28, Cool Depo. at 43).  Triplett received a copy of the email from C/O Shepard.  (Triplett Depo. at 30-32).

On March 5, 2009, Lt. Miller conducted a staff meeting, which Triplett attended but Messer did not.  In that meeting, Lt. Miller discussed "chain of command" issues regarding officer complaints.  Lt. Miller also distributed a memo regarding staffing assignments on Mondays, wherein all staff were to be designated as "relief" staff and would not be permitted "post pick."  The Union filed a grievance concerning the memo and "chain of command" discussion.  (Doc. 25-25, Triplett Depo., Exh. 13 at 1).  Ultimately, the parties agreed that employees are not limited to specific "chain of command" when alleging discrimination/harassment.  (Doc. 23-24, Messer Depo., Exh. 14).

After Messer's first meeting with the Warden and the "herd" email, Messer received four or five telephone calls in which the caller would moo and/or hiss.  (Messer Depo. at 56, 144-145).  Messer was unable to discern whether the caller(s) were male.  (Messer Depo. at 148).  Triplett received three or four similar calls, but she also did not know who placed the calls.  (Triplett Depo. at 96, 105-06).

On March 16, 2009, Messer had a second meeting with Warden Kerns, C/O

Shepard, two EEO staff, and Defendant Morgan, as a follow up to their March 3, 2009 meeting.

Beginning in March 2009, for a period of 37-39 days, Triplett testified that a camera attached to the ceiling in the visiting room, ordinarily used to conduct surveillance on inmates and visitors, was instead focused on her desk in retaliation for her complaints. (Triplett Depo. 32-33, 194-195). Messer similarly claims that two other cameras were focused on her post at the west desk. (Messer Depo. 93). Plaintiffs concede that the cameras were "initially legitimately positioned,"[5] (Doc. 36 at 8), but allege that Lt. Miller later used the cameras on at least two occasions to monitor and intimidate them. (Triplett Depo. 194-195, Messer Depo. 165-166). Triplett filed a grievance about the cameras on May 29, 2009. Warden Kerns spoke with Triplett in response to her grievance in mid-June 2009 and informed her that the cameras had been moved. (Triplett Depo. 34-35, 188-90). As a result, Triplett withdrew her grievance. (Triplett Depo. 190-191; *see also* Doc. 23-36, Messer Depo. Ex. 25).

On April 6, 2009, the mail room area was moved to another physical location in the prison. Plaintiffs aver that the move was retaliatory, so that the two Plaintiffs in this case could not "watch each other's back." (Doc. 36-2 at ¶28). The record reflects that the mail room was returned to its pre-April 2009 location in 2011, after Plaintiffs left SOCF employment.

On May 9, 2009 and/or May 15, 2009, Messer and Triplett filed formal charges of

---

[5]There is some evidence that the cameras were initially placed on the south and west desks to observe Plaintiffs' coworker, C/O Ferguson, after Plaintiffs complained of that officer sleeping at his post. It is undisputed that Lt. Miller had no control over the placement of the cameras. (Messer Deposition 94-95; Triplett Deposition 34, 194).

discrimination and retaliation with the OCRC.

On May 18, 2009, on the last day she was assigned to work in the mail room,[6] Messer observed that a sign with movable letters had been altered to display:  "MATEY I LUV COOTERZ PAWN," an alleged reference to female genitalia. (Messer Depo. 105-106, 112-13, 186-187).  Messer waited to report the sign until Saturday, May 30, 2009, so that she could report it to Capt. Bell.  Triplett never saw the sign, but later learned of it.  (Triplett Depo. 36, 191-92).  Miller testified that he did not learn of the sign until he returned to work on Monday, June 1, at which time he threw the sign away and questioned mail room staff.  Plaintiffs do not directly dispute that Miller threw the sign away, but aver that a "Mr. Cadogan" was the person who made sure that the sign was removed.  (Doc. 36-2 at ¶53).  Lt. Miller received a two-day suspension as a result of his failure to supervise.  (Miller Depo. 51).

On May 27, 2009, Miller gave Triplett a performance evaluation which reflected a score of "meets" expectations in various measures.  The evaluation was significantly lower than Triplett's prior evaluations, in which she had received "perfect" scores or scores that were "above" expected measures.  Triplett appealed the evaluation, alleging that it was made in retaliation for her May 2009 EEO action.  The evaluation was upheld pursuant to a policy that states that satisfactory evaluations are not appealable.

In June, 2009 on three separate dates, Officer Kraft acted out in the presence of Triplett by "flailing his arms," "spanking his butt," and "throwing his arms above his head,

---

[6]Messer testified that she believed that she was deliberately not assigned to the mail room in violation of Union contract provisions, and that "younger officers in age and seniority and male and female…worked down there instead of me and Triplett." (Doc. 23-4 at 106).

laughing and giggling" in a manner Triplett described as "childish."  (Triplett Depo. 35-37).  On one occasion, Ferguson egged Kraft on by laughing.  (Triplett Depo. 129).  Messer witnessed the same behavior on one date.  (Doc. 23-27, Messer Depo., Exh. 16).  Both Messer and Triplett interpreted the behavior as Kraft's way of showing that he had his bottom spanked over the "cooterz" sign incident.  (Messer Depo. 189, Triplett Depo. 192-193).  Triplett filed an Incident Report on each of the three occasions and reported Kraft's behavior to Capt. Bell.

On June 17, 2009, Plaintiffs each signed an Incident Report alleging that Miller was subjecting them to a hostile work environment.  On June 18, 2009, Deputy Warden Morgan pulled both Messer and Triplett from their assigned posts.  Triplett testified, consistent with Morgan's account, that the Warden pulled them because he "couldn't allow us to keep working in a hostile work environment."  (Triplett Depo. 43-44).

On June 23, 2009, Plaintiffs met with Warden Kerns and others, and Kerns told them that Lt. Miller would no longer be their supervisor.  (Triplett Depo. 49-50, 209).  Messer and Triplett completed another Incident Report stating that they were comfortable returning to their posts as part of the grievance resolution.  They returned to their posts on June 29, 2009.

After their return, Plaintiffs believed that Lt. Miller would not be speaking to them in the future.  (Triplett Depo. 208). However, Plaintiffs testified that Lt. Miller continued to supervise them as their "special duty supervisor" on Mondays for more than a month, up until the date of his transfer to another post on August 16, 2009.  Miller testified that he transferred at his own request.   On August 11, 2009, Plaintiffs filed another

9

grievance concerning Miller's continued limited supervision, which they withdrew shortly after he transferred. (Doc. 38 at 1, 7).

On one date between June 29 and August 16, 2009, Lt. Miller gave Messer an order, but she responded that she would not speak to him without first talking to her lawyer. Triplett testified that Miller answered the telephone 4-5 times in the supervisor's office when she would call in on Mondays to receive her job assignment, during the approximately 6-week time period when she believed he was no longer supposed to be supervising her. (Triplett Depo. 60-61). However, she refused to speak to him and would hang up. On fewer than five occasions, Miller gave her an assignment. (Triplett Depo. 61-62, 223). Both Plaintiffs aver that Miller continued to "call us regularly to intimidate us under the guise of 'visiting issues'" until he transferred in August. (Messer Affidavit ¶47; Triplett Affidavit ¶59).

On July 20, 2009, Lt. Miller allegedly responded to a phone call from Triplett by stating to C/O Shepard, "when this shit is over that bitch better retire." Miller has denied making the comment. Triplett subsequently learned of the remark from C/O Shepard.

On October 29, 2009, both Plaintiffs were on approved leave, visiting the OCRC Dayton office. On the same date, the Union and ODRC announced that Triplett's and/or Messer's positions were being abolished as part of a reduction in force that abolished 12 positions at the prison.[7] Prior to that date, Plaintiffs testified that their positions were

---

[7]While the record isn't entirely clear, it appears that Triplett's position was first listed for abolishment on October 29, 2009, but that a later finalized list included Messer's position rather than Triplett's position. Messer grieved the abolishment of her post without success. (*See* Doc. 37-2). Although twelve "posts" or positions were scheduled to be abolished, neither Messer nor Triplett was scheduled to lose their employment or benefits. After Messer's post was eliminated, Messer was required

not among those proposed to be abolished.  After her post was eliminated, Messer was approved for FMLA leave for "stress" from November 21, 2009 until January 15, 2010. Following her return, she worked in the alternative post to which she bid after the abolishment of her original visiting post position, until her resignation on June 16, 2010. Messer states that the alternative post was the only one she could handle "mentally" in light of the harassment against her.  (Messer Affidavit at ¶13).

On November 10, 2010, both Triplett and Messer filed additional charges of discrimination with the OCRC, based upon the alleged targeted elimination of their posts,[8] on or about October 29, 2009, in retaliation for their complaints.  Messer's prior administrative grievance had been denied.  (Messer Depo. 244-246).  However, in their response in opposition to summary judgment, Plaintiffs continue to assert, relying upon Messer's grievance, that "male temporary officers" were assigned to work Messer's post after it was abolished.  Relying upon evidence from the same grievance process, Defendants respond that their investigation and work logs demonstrated that Messer was mistaken, and that no inappropriate assignment of male correctional officers occurred.

Four months following the abolishment of Messer's post, on March 8, 2010, at a time when Triplett was not present, Triplett's desk and the wall telephone near her desk in the visiting room were removed.  (Triplett Depo. 79-82).   SOCF staff stated that the desk was removed after an inmate porter had broken the desk leg while buffing floors, although  Triplett  never  saw  the  broken  desk.   (*Id.*,  Triplett  Depo.  234).   Triplett

to post for a new position.
        [8]The record reflects that only Messer's assigned post was ultimately eliminated.

11

complained to Lt. Ison.  The desk was returned on March 11, and the telephone was returned on March 15, 2010.  (Docs. 25-54, 25-54, Triplett Depo. Exh. 41-42).  Capt. Cool testified that the telephone was removed and replaced after another officer reported it was broken.  (Cool Depo. 26-27).  Triplett was pleased with Lt. Ison's response to her complaint about the desk and phone.  (Triplett Depo. Exh. 42).

On three occasions in April and May 2010, Plaintiffs allege that they were issued "corrective counseling" and/or pulled from their posts in retaliation for protected activities.  First, on April 12, 2010, Miller issued Triplett a "corrective counseling," a non-punitive action, for failing to follow proper call-off procedures (by failing to speak to Miller).  Triplett does not dispute the procedural violation but testified that it was common practice, and alleges that Miller singled her out for the corrective counseling. (Triplett Depo. 84-87).

Second, on May 3, 2010, Triplett was pulled from her visiting area post for a fact finding investigation into an allegation that she had been rude to inmates and their families.  (Triplett Depo. 45, 87, see also Docs. 25-64, 25-65, Deposition Exhibits 52-53).  On August 25, 2010, the matter progressed to a hearing before SOCF Business Administrator Denise Gray, who found no probable cause for discipline.  (Doc. 25-76, Triplett Depo. Exh. 64).  Triplett was informed that she could return to her post on August 26, 2010, but indicated that she was fearful to return, without discipline of "dirty staff."  In lieu of returning, Triplett bid and was awarded a position in "K5 Utility," the position she had worked during the investigation.  Triplett subsequently filed another charge with OCRC regarding Miller's corrective counseling for failing to follow the call

12

off procedure, and regarding her removal from her post pending an investigation of inmate complaints.  (Doc. 25-66, Triplett Depo. Exh. 54).

The third corrective counseling incident occurred on May 19, 2010, when Messer received a corrective counseling for accepting a telephone call that lasted 62 minutes and allegedly cost SOCF $6.  Messer filed a grievance, asserting that it was in retaliation for her prior EEO activity, and that other officers had not been disciplined for similar violations.

On June 16, 2010, Messer telephoned in her resignation, stating that she feared for her safety.  (Messer Depo. 196-198).  Messer avers that she was placed in fear of her safety when she was advised by an inmate's girlfriend that the Warden had instructed her [the girlfriend] to ask about Messer's work schedule.  Messer explains that she was fearful because she was then having "problems" with the inmate and his friends.  (Messer Affidavit at ¶22(4)).  Although Messer implies that this occurred at the time of her resignation, no dates or names are provided, leaving the record unclear as to when the incident occurred.

Triplett continued to work at SOCF for an additional six months following Messer's resignation in June 2010.

On September 29, 2010, Triplett filed a fourth and final OCRC charge, alleging retaliation and gender discrimination based upon learning, during the August 2010 fact-finding investigation, of "rumors" being spread about her having an affair with a male corrections officer. (Doc. 25-77, Triplett Depo. Exh. 65).  She later withdrew that charge. (Triplett Depo at 267).

13

On November 27, 2010, Triplett discovered comments on the south desk calendar near her work area.  The comments, marked on the dates that Plaintiff Triplett had last worked in the same area, included the words "foulness" or "foul odor" and "smelled like brimstone" or "fire&brimstone."  (Triplett Depo. 88-90; Doc. 40-1 at 1). Triplett believed the unknown author was targeting her for harassment.[9]  Plaintiff complained to Capt. Bell, who took photographs and completed an Incident Report. (Doc. 40-1 at 1).  Triplett observed the comments because she occasionally continued to work overtime shifts in the visiting area, despite having been reassigned to a different area of the prison.  The author of the comments was not determined, and no known action was taken with respect to the calendar remarks.  (Doc. 27, Bell Depo. at 14-16).

On December 16, 2010, Triplett resigned.  She asserts that she was "forced to take a medical disability" for "stress, anxiety and post-traumatic stress syndrome" after experiencing "heart attack and similar symptoms."  (Doc. 36-2 at 16-17, ¶73). She subsequently sought and was approved for disability retirement on September 2, 2011, effective as of October 1, 2011.[10]

---

[9]As part of her proof, Plaintiff has attached as an exhibit to her affidavit an alleged transcript dated February 26 (presumed 2010) from a chat room on a public website (not administered by or affiliated with Defendants) called Topix.  In the transcript, unknown persons discuss a female "queen viper" who works in "visiting" at SOCF.  A person identified as "fly on the wall" states that he/she overheard a visitor "stating that she had a wonderful visit today that old woman with no neck wasn't there."  In response, someone identified as "chance" states: "gee the queen viper must not of been there, but then again i didn't smell brimstone and hear hate coming out of the visiting room when i left." [sic]. (Doc. 40-1 at 3, spelling and punctuation original).

[10]The record is unclear as to Triplett's employment status at SOCF between the date of her resignation and the effective date of her disability retirement some 10 months later.

## II. Analysis

### A. Summary Judgment Standard

In considering a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007)(internal quotation marks and additional citations omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c), internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the nonmoving party, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986). The non-moving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255

15

(emphasis added).

Although reasonable inferences must be drawn in favor of the opposing party, inferences are not to be drawn out of thin air. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (additional citation omitted).

There is no doubt that at least some of the incidents of which Plaintiffs complain in this case can be described as gender-based harassment or discrimination. There is also little doubt that Plaintiffs subjectively believe that they were forced to endure a litany of petty slights. However, neither general incivility nor every incident of gender-based harassment is actionable under the law. Under controlling Sixth Circuit case law, Defendants have demonstrated that they are entitled to summary judgment on Plaintiffs' hostile work environment claim, as well as on any claim of constructive discharge, because the incidents taken as a whole, and as experienced by each Plaintiff individually, were not so severe and pervasive so as to alter Plaintiffs' conditions of employment. Plaintiffs also are unable to overcome controlling Sixth Circuit case law to show that they were subjected to a materially "adverse" employment action, and therefore cannot overcome Defendants' motion for summary judgment on their gender discrimination claims. For the same reason (the failure of proof of adverse action), Defendants are entitled to judgment on Plaintiffs' retaliation claims.

16

**B.  Hostile Work Environment Claim**

Defendants argue that neither Plaintiff can establish that she encountered a hostile work environment based upon either her gender or her age.  To prove a claim of hostile work environment, <u>each</u> Plaintiff must demonstrate that:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [age or gender], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011)(citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078–79 (6th Cir.1999)). Defendants concede only that Plaintiffs are members of a protected group, because they are female and because they are over the age of 40.

Defendants argue that they are entitled to judgment as a matter of law because neither Plaintiff can establish the remaining four elements of her prima facie case.  The undersigned agrees that neither Plaintiff can show any age discrimination at all, and that neither Plaintiff can show that the limited gender-based harassment that allegedly occurred was sufficiently severe or pervasive to alter the conditions of her employment.

**1.  General Deficiencies of Plaintiffs' Response**

Plaintiffs do not directly respond to Defendants' arguments. Therefore, Defendants assert in their reply that Plaintiffs have "abandoned" their hostile work environment claim. (Doc. 43 at 3).  It is true that Plaintiffs' response contains serious deficiencies, in that it discusses only discrimination and retaliation claims, without

17

acknowledging the different and distinct elements of a hostile work environment claim. However, rather than concluding that Plaintiffs have abandoned their constructive discharge claim,[11] the undersigned concludes that Defendants are entitled to judgment because the evidence precludes Plaintiffs from proving that the alleged harassment was sufficiently severe or pervasive.

With rare exceptions involving citations to a handful of pages of deposition testimony, Plaintiffs' response almost exclusively relies upon their respective affidavits. On the record presented, those affidavits are insufficient to create a genuine issue of material fact. The affidavits are replete with vague allegations of discrimination and retaliation, some of which clearly contradict Plaintiffs' prior deposition testimony. The affidavits rarely refer to other admissible evidence, and are nearly devoid of factual support, such as the dates that the events allegedly occurred, or participants' names. For example, each of the affidavits states generally that Plaintiffs have in the past "and continue to be subjected to sexual harassment and other embarrassing and humiliating terms and conditions of employment based upon our sex and/or age." (Docs. 36-1, 36-2 at ¶21). Neither this conclusory sentence, nor the lengthy list of allegedly discriminatory terms and conditions that follows it, includes relevant details. Instead, the affidavits assert that the alleged discriminatory acts include but are "not limited" to the following -on unspecified dates and by unspecified persons:

---

[11]A few references in Plaintiffs' response suggest they are still pursuing this claim. (*See, e.g.*, Doc. 36 at 6, alleging that "plaintiffs were both constructively discharged as a result of their complaints…" (citing Messer and Triplett Affidavits at ¶24); Doc. 36 at 11, arguing that Plaintiffs have established their prima facie case on multiple claims including "hostile work environment"; Doc. 36 at 16, 20, arguing that harassment was "so egregious" to amount to "constructive discharge"; and Doc. 36 at 16-17, arguing that incidents were "repeated, regular and offensive activities by supervisors and co-workers.").

(1)  being referred to as "bitches", "cows" and "snakes" by [unspecified] male employees;

(2) being referred to, along with other female employees, as "the herd" by our supervisor in an email to the Warden;

(3)  the area in which we worked being referred to as "the snake pit";

(4) being subjected to mooing and hissing sounds by male employees[12] and by supervisor defendant Lt. Miller;

(5)  Being subjected to derogatory language and vulgar epithets by male employees based upon our sex;[13]

(6) being subjected to sexual and offensive signs and graffiti posted throughout our workplace;

(7) being physically threatened, including the use of sexual gestures, when we complained of the foregoing; and

(8) being threatened with loss of employment and/or position(s) for our complaints.

(Doc. 36-1 at ¶21, Doc. 36-2 at ¶21).

On the same day that they filed their response, Plaintiffs filed 92 pages of "exhibits in support to affidavits," including 61 pages described as "attachments to Messer Affidavit," and another 31 pages described as "attachments to Triplett Affidavit." (Docs. 37, 38, 39, 40).  The various exhibits primarily consist of documents relating to

---

[12]Contrary to this affidavit, Messer testified that she could not determine whether the anonymous calls were from male or female employees.  (Messer Depo. at 145).

[13]As discussed below, this portion of the affidavit also contradicts Plaintiffs' deposition testimony.

the administrative proceedings before the OCRC and the EEOC.  However, Plaintiffs reference the exhibits only in the most general terms, without page citations that would benefit the Court.  (*See* Doc. 36-2 at ¶7, directing the Court to "Exhibits A, B, C and D, K, and L.").

By way of example of the inadequacies of Plaintiffs' affidavits, the reference to "being physically threatened, including the use of sexual gestures, when we complained" fails to indicate what kind of physical threats, what kind of gestures, the dates such threats occurred, who made such threats, when plaintiffs complained, to whom, or any other salient details.  While this Court can piece together the details of some of the alleged incidents from Defendants' citations to the record, the Court cannot locate any evidence supporting many of Plaintiffs' allegations (including the physical threats).

As the Sixth Circuit has explained, "Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make her case with a showing of facts that can be established by evidence that will be admissible at trial."  *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

> The submissions by a party opposing a motion … need not themselves be in a form that is admissible at trial…. Otherwise, affidavits themselves…may not suffice….  However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary.

*Id.* (internal citations omitted).  A conclusory affidavit that does little more than express a plaintiff's subjective belief that she was discriminated against is not sufficient to defeat

20

summary judgment.  *Id.* at 559-560 (granting summary judgment to employer on plaintiff's race-based discrimination claim, notwithstanding EEOC letter finding "probable cause," which letter was later withdrawn and declared null and void by the agency); s*ee also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992)(plaintiff's subjective belief insufficient to maintain claim of race discrimination); *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)(holding that a nonmoving party has an affirmative duty to direct the court's attention to specific portions of the record upon which the nonmovant seeks to rely to create a genuine issue of material fact).

Plaintiffs' representations at oral argument were similarly lacking in relevant details, and sometimes contradicted by evidence of record.  For example, although counsel represented that she learned for the first time at oral argument that Defendants were claiming that Miller's email reference to Triplett being the leader of a "herd" was a gender-neutral reference to a shepherd leading a herd of sheep (as opposed to a herd of cows), that explanation was provided during discovery in this case.

Having noted the serious deficiencies of Plaintiffs' response in general, the Court turns now to the specific elements of Plaintiffs' hostile work environment claim.

### 2.  Harassment Based on Age and/or Gender

With respect to the second and third elements of Plaintiffs' hostile work environment claim, Defendants first contend that there is no evidence that Plaintiffs were "harassed" based on either gender or age.  Defendants contend that – contrary to the very general assertions in their affidavits - Plaintiffs testified in deposition that they were not subjected to any age or gender-based comments.  (*See, e.g.*, Doc. 25-2 at 55,

21

60, Triplett's testimony that she never heard anyone comment about her age or gender.).

As Defendants point out, many if not most of the alleged incidents fall within the realm of petty slights, and do not appear to bear any relationship to Plaintiffs' gender. However, Defendants' interpretation of the entirety of proof on this element is not accurate. Despite her inability to recall *any* specific examples, Messer's deposition contains general testimony that she heard gender-based jokes and comments from supervisors over her entire 15-year employment, and that supervisors also made age-based jokes. (Doc. 23-7, Messer Depo at 198-199). While weak, the undersigned assumes that some of the alleged comments or jokes occurred during the time frame of December 2008 until Messer's resignation in June 2010. Moreover, the record contains evidence of three incidents of arguably gender-related comments during the relevant time period: (1) Miller allegedly referring to Plaintiff Triplett as leader of a "herd" in a March 2009 email; (2) a May 2009 poster, observed by Messer, referring to female genitalia; and (3) Supervisor Miller allegedly referring to Triplett as a "bitch" in July 2009. While Defendants maintain that the incidents do not reflect discriminatory bias, they are sufficient to show gender-related bias at the summary judgment stage.

With respect to the first incident, in which Lt. Miller acknowledged describing Triplett as the leader of "the herd," Defendants argue that the referenced email has "no facially apparent gender connotations." (Doc. 31 at 33). Lt. Miller testified that he meant only that certain employees – including some men – were like sheep being directed by a shepherd (Triplett). However, Plaintiffs dispute Miller's characterization,

since he offered no such explanation at the time of the incident.  The record also includes a witness statement from the OCRC investigation, reflecting that the Union President stated that "Lt. Miller had referred to the female Corrections Officers as cows." (Doc. 37 at 3); *see also Chandler v. Roudebush*, 425 U.S. 840, 863 n. 39 (1976)("Prior administrative findings made with respect to an employment discrimination claim may...be admitted as evidence at a federal-sector trial de novo.").  Although some of their testimony was inconsistent, Plaintiffs also testified that they were repeatedly referred to as "cows" and "snakes" by male employees, including but not limited to Lt. Miller, and that mooing and hissing sounds were made to them in anonymous phone calls.

In the second undisputed incident, someone prominently posted in Plaintiffs' work area a sign stating "I luv Cooterz" -an apparent reference to vaginas.  Messer observed the sign and complained of it; Triplett later learned of the incident.  Although a factual dispute exists concerning when Lt. Miller became aware of the sign, he received a two-day suspension over the incident, based upon his failure to properly supervise.[14]

In the third incident, Plaintiff Messer asserts that Lt. Miller harassed or retaliated against her when he allegedly reacted to a July 20, 2009 telephone call from Triplett by stating to another officer: "when this shit is over that bitch better retire."  (Doc. 38-1 at 3; Doc. 36-2 at ¶22).  Because Plaintiffs learned of the comment second-hand, Defendants assert that it is hearsay and cannot be used to defeat summary judgment.  However, a party opposing summary judgment need not present all evidence in

---

[14]Plaintiffs' counsel [mis]stated at oral argument that Miller was never disciplined, but the parties agreed in written memoranda that the record reflects otherwise.

admissible form, so long as it is clear that admissible evidence exists. *See Alexander v. Caresource*, 576 F.3d at 558.  Here, C/O Shepard allegedly heard the comment and filed a written grievance over it.  (Doc. 38-1 at 1, 3).  Even though Lt. Miller denies the comment and Triplett's own account might be excluded as hearsay, C/O Shepard's grievance and the EEOC documentation may be considered.  *See Alexander*, 576 F.3d at 562; Fed. R.Evid. 803(8).

With the exception of the poster, Defendants protest that the incidents are not "even remotely related to gender." Defendants further assert that even the poster "does not support the assertion that the unknown author meant it to be sexually derogatory." (Doc. 31 at 34).  Defendants seek summary judgment on grounds that, if harassment occurred, it was not motivated by an unlawful animus.

The Court cannot agree with Defendants' non-gender based explanations, because to do so would require this Court to draw conclusions in Defendants' favor regarding multiple disputed facts.  As the Sixth Circuit acknowledged in *Bowman v. Shawnee State Univ*., 220 F.3d 456 (6th Cir. 2000), even "[n]on-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, [she] would not have been the object of harassment."  *Id.* at 463, citing *Williams v. General Motors Corp*., 187 F.3d 553, 565 (6th Cir. 1999).  The inferences that Defendants seek to draw are inappropriate on summary judgment, when all reasonable inferences must be drawn in the light most favorable to the non-moving party.  Unlike in *Bowman*, wherein the male plaintiff who alleged harassment by a female supervisor failed to offer *any evidence at all* that the

24

alleged harassment was based upon his status as a male, the three referenced incidents are reasonably construed as gender-specific. *See, e.g., Williams*, 187 F.3d at 565-566 (gender bias was demonstrated by gender-specific epithets such as "slut" and "f---ing women."). Plaintiffs have offered additional evidence that also could be reasonably be perceived as relating to gender ("cow" and "mooing" references).[15] Given the totality of the evidence, Defendants are not entitled to summary judgment on grounds that Plaintiffs have failed to show gender-specific harassment.

By contrast, I conclude that the evidence of any age-based animus is so weak (with only the single "that bitch better retire" comment relating to Plaintiff Triplett), that Defendants are entitled to summary judgment on Plaintiffs' age-based hostile work environment claim. Plaintiffs also failed to discuss any evidence in support of an age-based claim at oral argument. Other than conclusory assertions that their harassment was gender "and/or" age based, Plaintiffs offer no supporting evidence at all of age-based animus.

### 3. Whether the Harassment Was Sufficiently Severe or Pervasive

While offering sufficient evidence to overcome summary judgment on whether

---

[15]Plaintiffs' evidence concerning the term "viper" or snake is mixed. For example, Plaintiff Triplett has filed as an exhibit a purported transcript dated February 27 (no year stated) from the commercial website Topix, a site unaffiliated with Defendants that contains "chat rooms" in which unidentified (alleged) former and/or current employees discuss prison matters. (Doc. 39-4). Defense counsel represented at oral argument that Plaintiffs testified that they had never posted on Topix, did not have user names for that website, and never brought Topx to Defendants' attention. In any event, the Topix transcript filed by Triplett includes a conversation in which someone named "britgirl" lambasts "Al" and states that "He is a big time SNAKE." In response, someone named "Chance" expresses eagerness to see the reaction of "the girl on the third shift" when she learns that "the Viper crashed her out just like she did with the other females that have worked with it in the past." In other words, the use of the word "Viper" and "snake" as a derogatory term appears to be used for both males ("Al") and females at SOCF in the referenced conversation. (*Id.* at 2).

they endured "gender" related harassment, Plaintiffs do not fare as well when the fourth element of their hostile work environment claim is examined -whether the harassment was sufficiently severe or pervasive. Title VII does not protect against general incivility or minor slights, but only against a workplace that is so "permeated with discriminatory intimation, ridicule, and insult" that it effectively "alter[s] the conditions of the victim's employment and create[s] an abusive working environment." *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 (6th Cir. 2012)(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(internal quotations omitted)). Thus, a plaintiff is required to show not merely that harassment occurred, but that it was sufficiently severe or pervasive. *See also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *Bowman*, 220 F.3d at 463-464.

This element of a hostile work environment claim has both an objective and a subjective component. Therefore, a plaintiff must show both that a "reasonable person" would find the environment to be hostile or abusive, and that she subjectively perceived it to be abusive. *Berryman,* 669 F.3d at 717. Each of the two Plaintiffs in this case must prove her claim based upon the alleged discrimination that she *individually* experienced or perceived, or was aware of, and not merely by combining both Plaintiffs' claims in the aggregate.[16] *Id.* at 717-718.

In determining whether harassing behavior is sufficiently severe or pervasive to state a hostile work environment claim under Title VII, courts will consider a multitude of factors, including "the frequency of the discriminatory conduct; its severity; whether it is

---

[16]Plaintiffs' written and oral arguments consistently describe the alleged discrimination in joint terms only.

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 468 (6th Cir. 2009)(internal quotation omitted). "[T]here is no bright line between sexual harassment and unpleasant workplace conduct." *Robbins v. Columbus Hospitality, LLC*, Case No. 1:09-cv-559-HJW, 2011 WL 221879 (S.D. Ohio Jan. 24, 2011). However, to prove the requisite severity, the "conduct must be extreme." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing,…offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.*

A plaintiff need only show that the conduct was severe "or" pervasive, not both. *Barrett v. Whirlpool Corp.,* 556 F.3d 502, 514 (6th Cir. 2009). Although the inquiry is "'quintessentially a question of fact,' summary judgment is appropriate when no reasonable jury could find in favor of the plaintiff." *Hill v. Nicholson*, 383 Fed. Appx. 503, 511 (6th Cir. 2010)(quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007)(additional internal quotation marks omitted)).

The Sixth Circuit has made clear that in determining whether conduct violates the requisite standard, courts should not excuse some degree of sexual harassment merely because it occurs in a blue collar environment on a factory floor, as opposed to a white collar environment such as a courthouse. *See Williams*, 187 F.3d at 564 ("We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment; indeed, we find this reasoning to be illogical, because it means that the more hostile the environment, and the more

27

prevalent the sexism, the more difficult it is for a Tile VII plaintiff to prove that sex-based conduct is sufficiently severe or pervasive to constitute a hostile work environment."); *see generally Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724 (6th Cir. 2006)(female corrections officer sufficiently alleged hostile work environment).  At the same time, the undersigned does not interpret the Sixth Circuit's directive concerning the uniform *standard* to be applied to require courts to completely ignore context.  For example, because the parties agree that employees are required to review pornography sent to inmates, the mere existence of that task would not be evidence of discrimination. By contrast, to the extent that Plaintiffs have testified that Kraft and other male employees spent excess time reviewing pornography while Plaintiffs were given more difficult work, such evidence could support their claim.

Whether the alleged harassment originated from co-workers or from supervisors may be relevant in the analysis of whether the employer is liable for the harassment, but that fact is not relevant in the determination of whether the harassment was sufficiently severe or pervasive.  *Williams*, 187 F.3d at 562-563.  Likewise, while the issue of whether or not a plaintiff reported alleged harassment may prove relevant to the issue of employer liability, whether or not the victim reported her harassment is not relevant to whether the harassment was severe or pervasive.  *Id.* at 567.

Considering the totality of the incidents of harassment alleged in this case, and applying the above principles, Plaintiffs have not presented evidence of harassment that is sufficiently severe or pervasive so as to make out a claim of a hostile work environment.  Despite Plaintiffs' arguments that the harassment they endured would

satisfy either the "pervasive" or "severe" standards, the evidence reflects only isolated and sporadic gender-related incidents.  Plaintiffs' arguments are frequently overstated and contradicted by record evidence.  For example, contrary to Plaintiffs' allegation that they were "repeatedly" referred to as "bitches," the evidence offered by Plaintiffs reflects only a single offensive "bitch" remark by Miller in July 2009, learned of by Plaintiffs second-hand, that referred to Triplett.  In addition, at oral argument counsel for Plaintiffs indicated that both Plaintiffs experienced daily harassment, but the record does not support that allegation.

In *Chancellor v. Coca-Cola Enterprises, Inc.*, Case No. 1:08-cv-65, 2009 WL 4674058 (S.D. Ohio, Dec. 3, 2009), the court reached a similar conclusion concerning a would-be plaintiff's race-based harassment claim.  The analysis in *Chancellor* is instructive, insofar as the same presiding judge assigned to this case carefully reviewed and compared Sixth Circuit case law regarding similar claims.  In order to satisfy the "severe or pervasive" standard, the court in *Chancellor* emphasized that the severity or pervasiveness must interfere with a plaintiff's ability to perform her job.  Although *Chancellor* involved racial harassment, the standard for determining whether harassment is severe or pervasive remains the same.

As in *Chancellor*, the vast majority of the incidents of which Plaintiffs complain have no connection at all to Plaintiffs' gender.  Moreover, the few incidents that reasonably can be construed as gender-based are even less severe than incidents in many other cases in which judgment has been granted to the defendants.  *See id.* at **7-9 (collecting cases); *see e.g.*, *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 707

29

(6th Cir. 2007)(upholding district court's determination that the harassment which included 15 specific incidents over a two-year period "did not rise to the level of severity or pervasiveness that would unreasonably interfere with her ability to work."); *Burnett v. Tyco Corp.*, 203 F.3d 980, 984-985 (6th Cir. 2000)(six-month period involving three sexually offensive remarks by supervisor, including a battery, did not constitute pervasive conduct); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000)(teasing, comments, and isolated incidents, including an unwanted sexual advance, did not alter terms and conditions of employment); *Dotson v. Norfolk Southern R.R. Co.*, 52 Fed Appx. 655, 659 (6th Cir. 2002)(conduct including coworker's persistent use of "KKK" instead of his own initials on work documents, coworker's use of term "Ungawa" from Tarzan movies as salutation, coworkers' use of names such as "tar baby" and harsh treatment of plaintiff, managerial use of janitorial service that employed worker who harassed plaintiff, and allegations of disparate discipline and promotional practices - all still insufficient to satisfy severity component of claim); *Bowman*, 220 F.3d 456 (three of five incidents which "contained an element of physical invasion" were insufficiently severe or pervasive).

By contrast, cases in which the Sixth Circuit has held that the complained-of conduct was sufficiently severe or pervasive involve significantly more serious conduct than at issue here, and/or comments that are more directly aimed at the plaintiff. "While offensive comments need not be directed at the complaining individual in order to contribute to a hostile environment, secondhand information and rumors do not carry the same weight as do comments directed at an individual or that an individual

30

overhears." *Chancellor*, 2009 WL 4674058 at *14.  In this case, as discussed, Plaintiffs learned of the "bitch" and "herd"[17] comments second-hand.  Although Messer testified that she saw the "cooterz" poster and both Plaintiffs arguably experienced a more tangible first-hand impact when they received a handful of "mooing"[18] or "hissing" anonymous telephone calls, those few incidents, even when viewed in totality with all other incidents, cannot be viewed as creating an environment so hostile that the very terms and conditions of Plaintiffs' employment were altered.

In their response, Plaintiffs suggest that part of their claim involves awareness by Miller of "sexual items" in the work area which he "disregarded."  However, Plaintiffs point to no evidence to support this conclusory assertion.  While this Court can speculate that Plaintiffs may be referring to Miller's testimony that he immediately directed the removal of posters of "bikini-clad women" that he observed in the course of moving the location of the mail room, (*see* Doc. 29-1 at 26-27), there is no evidence that Plaintiffs were aware of those posters, or that Miller did not take immediate action.  *See, e.g., Berryman*, 669 F.3d at 719 ("We cannot assume Plaintiffs were aware of those things that they did not discuss in hundreds of pages of depositions.").

Similarly, while Plaintiffs complain that one male co-worker (Kraft) in particular spent an inordinate amount of time on his pornography-reviewing duties, and made inappropriate comments or "sounds" while performing those duties, Plaintiffs fail to cite

---

[17]Plaintiffs argue that the term "herd" is gender specific.  For purposes of this motion, the Court agrees; however, the Court notes that if Plaintiffs' argument is accepted, the reference appears to be limited to Messer and Triplett alone; Plaintiffs offered no evidence of any other women working in the area to whom the term could refer.

[18]Again, the Court assumes for purposes of this motion, that the "mooing" and "cow" references are gender-specific in this case.  At the same time, the Court recognizes the common association of the same reference to a person's size or girth, unrelated to gender.

specific record evidence to support those complaints.  Likewise, Plaintiffs fail to point to evidence to support their general allegation that gender bias played any role in the job duties that Miller assigned to them, or how (or if) their assigned duties were different than the duties assigned to male co-workers.  While the manner in which one coworker performed his pornography review duties may have been distasteful, to say the least, none of the conduct of which Plaintiffs complain appears to have been severe enough – such as involving a physical threat - or pervasive enough in frequency and degree- to objectively constitute a hostile environment.  *Compare Johnson v. United Parcel Serv., Inc.*, 117 Fed. Appx. 444, 454-455 (6th Cir. 2004)(plaintiff heard of racial comments and that his manager was a racist; plaintiff overheard use of word "nigger" from manager, division manager said he was "tired of African Americans complaining" in response to plaintiff's grievance, supervisor wrongly accused plaintiff of falsifying records, a terminable offense; supervisor threatened discipline without cause).  *See also Robbins*, 2011 WL 221879 at *5 (describing plaintiff's case as "not strong" but denying summary judgment where plaintiff alleged multiple incidents in six month period involving both rumors of her promiscuity and explicit comments by her supervisor that: (1) a "little birdie" had told him plaintiff was "sleeping with everyone at the front desk;" (2) "it's fun being a little trampy;" (3) that her nail polish must be "left over from her other job," implying prostitution; (4) asking "what she could do" with an extra corn dog; and (5) the male supervisor physically touching plaintiff's ears on three or four occasions); *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 352 (6th Cir. 2005)(hostile work environment claim not shown where employee complained of incidents involving vulgar jokes, a

supervisor twice placing his vibrating pager on her thigh, and the same supervisor pulling at her overalls after learning that she was wearing a thong); *Stacy v. Shoney's, Inc.*, 142 F.3d 436, 1998 WL 165139 at **1-3 (6th Cir., March 31, 1998)(over two month period, male supervisor continuously made sexually suggestive comments about plaintiff's appearance, touched her breast by removing and replacing pen from her shirt pocket, leered at her, and told her that if he had someone like her, he would never let her leave the house).

### 4. Defendants' Knowledge and Alleged Failure to Act

Defendants are entitled to summary judgment because Plaintiffs have failed to offer evidence that the alleged discrimination was severe or pervasive.  Therefore, it is unnecessary to discuss at length Defendants' alternative argument that Plaintiffs cannot show that Defendants knew or should have known of the hostile environment and failed to act.  However, in the interest of completeness, the undersigned concludes that Defendants would not be entitled to summary judgment on that alternate basis.

Defendants argue that they should not be held liable for the alleged co-worker discriminatory conduct, because Plaintiffs did not properly report the incidents, and/or that Defendants took appropriate action to resolve any issue once alerted to it. Defendants further contend that they were not specifically aware of Plaintiffs' "hostile work environment" claim until Plaintiffs filed a grievance alleging a hostile environment, at which time Defendants immediately removed Plaintiffs from Miller's supervision. Defendants argue that they cannot be held liable because Miller was transferred to a different department soon thereafter.

In contrast to Defendants' interpretation of the evidence, there is some evidence that Lt. Miller, a supervisor, was personally responsible for some of the alleged harassment.   Lt. Miller allegedly made the "bitch" and "herd" comments relating to Triplett, and was disciplined for his failure to supervise concerning the "cooterz" poster. Contrary to Defendants' contention that Plaintiffs failed to notify authorities, Plaintiffs and C/O Shepard filed multiple grievances.   In addition, the OCRC investigator noted that Warden Kerns met with Messer in March of 2009 where the Women's EEO Coordinator was present, and at which Messer expressed her concerns about gender bias.  (Doc. 37 at 2).   Miller was not transferred (and was only transferred at his own request) until August 2010.   Thus, Plaintiffs have offered sufficient evidence of Defendants' knowledge to survive summary judgment on that element.

## C. Constructive Discharge Claims

Both of the Plaintiffs in this case resigned from their employment, but include a general claim of constructive discharge.  At least arguably, that claim has not been waived on summary judgment, notwithstanding Plaintiffs' rather minimalistic arguments in response to Defendants' motion concerning this claim.  However, for the same reasons that Defendants are entitled to summary judgment on Plaintiffs' hostile work environment claim, Defendants are entitled to judgment on Plaintiffs' constructive discharge claims.  "For a resignation to constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit, and the employee must actually quit."  *Gentry v. Wells Fargo*, Case No. 1:04-cv-29, 2006 WL 2319987 at

*6 (citing *Logan v. Denny's*, 259 F.3d 558, 568-69 (6th Cir. 2001)).  "[C]ourts have held that constructive discharge requires **a greater degree of harassment than that required by a hostile environment claim**….Thus, where a claim for hostile work environment fails, a claim of constructive discharge based on hostile environment also fails."  *Id.* (emphasis added, citations omitted).

Plaintiffs argue that it is "outrageous" for Defendants to suggest that Plaintiffs' separations from employment did not amount to constructive discharge, particularly in light of the fact that SOCF approved Triplett's disability retirement based upon stress-related symptoms including anxiety, "post-traumatic stress syndrome" and a heart attack.  But the fact that an employee suffers from post-traumatic stress disorder or other mental impairment (or even a heart attack) is not evidence that her disability retirement amounts to a constructive discharge.  An employee may well suffer from a disabling mental or physical impairment without the cause of that impairment being a violation of Title VII.

### D.  Gender Discrimination Claims

Defendants are also entitled to summary judgment on Plaintiffs' gender discrimination claims.  To make out a prima facie case of gender discrimination, Plaintiffs must show that: (1) they are members of a protected class; (2) who suffered an adverse employment action; (3) that they were qualified for their positions; and (4) that they were replaced by a person outside the protected class or that similarly-situated, no-protected class members were more favorably treated.  *See McDonnell-Douglas v. Green*, 411 U.S. 792, 802 (1983).  If a plaintiff satisfies her prima facie

burden, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action.  If the Defendant satisfies its burden of production, then the burden shifts back to the plaintiff to show that the defendant's proffered reason for the adverse action was really a pretext for unlawful discrimination.  *McDonnell Douglas*, 411 U.S. at 802.

"[F]or purposes of summary judgment," Defendants assume that Plaintiffs can establish the first three elements of a gender discrimination claim.  (Doc. 43 at n. 4).  However, Defendants persuasively argue that neither of the two Plaintiffs have provided any evidence that she was treated less favorably than male officers.  Both as argued by Plaintiffs in their memoranda, and as presented at oral argument, the only adverse employment actions that appear to be at issue are: (1) the abolishment of Messer's posted position; and (2) the corrective counselings issued to Triplett and Messer.

Messer alleges she was replaced by several younger male employees who were "temporarily" assigned to her former position after that position was abolished.  However, Plaintiffs have failed to point to any admissible evidence – other than Messer's unsupported opinions- that such temporary assignments ever occurred.  Messer testified that her "evidence" consisted of calling different places, asking who was working the visiting room, and then writing down the information.  (Messer Depo. 252-256).  She subsequently filed a written grievance with the Director of ODRC, alleging that on twelve separate occasions, other officers worked in the post previously assigned to her.  (Doc. 23-47, Messer Depo. Exh. 36).  In this Court, she describes these replacement officers as younger "and/or" male.  However, Captain Cool reviewed

36

actual SOCF records and, in a written detailed response to the grievance, explained that Messer's allegations were inaccurate.  (Doc. 23-46, Messer Depo. Exh. 35).

Triplett also has failed to provide admissible evidence that she was treated less favorably than male officers.  Triplett alleges that she was singled out for enforcement of various rules, alleging that she was given corrective counseling for minor offenses while male officers were not.   However, Triplett admits that she did not follow proper "call off" procedure.  Although she filed as an exhibit a statement from grievance proceedings suggesting that the alleged violation was commonplace, she has failed to provide the name, gender or age of any similarly situated officer who did not receive corrective counseling for the same offense.  Like Triplett, Messer also claims to have received an unfair corrective counseling on one occasion, concerning the 62 minute telephone call, but has failed to produce evidence concerning any similarly situated male officer (other than the telephone records of substantially shorter telephone calls involving other officers).[19]

Last, Plaintiffs have failed to offer any evidence that Defendants' articulated reasons for the abolishment of Messer's position (the elimination of 12 staff positions for budget reasons), and for the corrective counseling issued to both Plaintiffs on separate occasions (for rule violations), were pretextual.  Put simply, it is not the duty of this Court on summary judgment to scour the record in an attempt to locate evidence to support Plaintiffs' claims.  *Abdulsalaam v. Franklin County Bd. Of Com'rs*, 637 F.

---

[19]Messer filed one exhibit that ostensibly shows that some officers made calls lasting 20-30 minutes, with one call lasting 39 minutes.  However, 62 minutes is substantially longer than any of the other referenced calls.

Supp.2d 561, 576 (S.D. Ohio 2009)(citing *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007)).

### E. Retaliation Claims

Last, Plaintiffs fall short in offering any evidence to demonstrate a genuine issue of material fact concerning their retaliation claims.  To prove retaliation, a plaintiff must show that she engaged in protected activity; that her employer knew of that activity; that she was subjected to an adverse employment action; and that there was a causal connection between the activity and the adverse employment action.  *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009)(internal quotation marks and additional citation omitted).   "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington North and Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).  In addition, the employee is not insulated from incidental slights, but only from harm that is sufficiently serious that it would dissuade "a reasonable worker from making or supporting a charge of discrimination."  *White*, 548 U.S. at 57.  As with discrimination claims, if a plaintiff proves a prima facie case of retaliation, the burden of production shifts to the employer to "articulate some legitimate, non-discriminatory reason" for its actions.  *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 19997)(quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981).  If the employer meets that burden, then plaintiff bears the burden of demonstrating that the employer's proffered reason was pretextual.  *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993))

Defendants argue strenuously that Plaintiffs were not subject to any adverse

38

employment action. At the outset, it must be noted that the "burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." *Michael v. Caterpiller Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007), *cert. denied*, 552 U.S. 1258 (2008), and has been described as a "relatively low bar." *Id.*, at 596. Nevertheless, Defendants argue that none of the alleged incidents of retaliation constitutes adverse employment action, even when viewed through the amplification of the "low bar" lens of a retaliation claim.

As discussed above, Plaintiffs' claim of constructive discharge falls on summary judgment and therefore does not demonstrate "adverse action." However, Plaintiffs also allege the following instances of "retaliation:" (1) Triplett being pulled from her bid post while she was investigated for allegedly being rude to inmates and their families; (2) Triplett receiving a downgrade in her May 27, 2009 evaluation from Lt. Miller; (3) Messer's receipt of corrective counseling and having to pay for an excessive telephone call; (4) Triplett's receipt of corrective counseling for failing to comply with the call-off procedure when she refused to speak to Lt. Miller; (5) both Plaintiffs' complaints of being counseled for unspecified "infractions" on unspecified dates; (6) Lt. Miller's comment that the "bitch" (meaning Triplett) "better retire" after "this shit is over," and the discovery of derogatory notes on a calendar near Triplett's work area; (7) the abolishment of Messer's post; (8) both Plaintiffs being pulled from their posts after filing a "hostile work environment" claim against Miller; (9) the temporary removal of Triplett's desk and telephone.

A review of these incidents makes clear that none of them constitute an adverse

employment action.   For example, the investigation of Triplett for rudeness cannot suffice, since the outcome was not unfavorable and her pay remained the same.  *See Russell v. Ohio*, 302 Fed. Appx. 386, 394 (6th Cir. Dec. 3, 2008)(investigation, resulting in favorable outcome to employee, is not an adverse action); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)(citing with approval case law holding that a "bruised ego" is not actionable).   Plaintiffs argue that other "various occasions" on which they were temporarily removed from their posts pending investigations constituted "materially adverse" retaliation, because Plaintiffs were prohibited on those occasions from working the "'bid post' which they earned based upon their seniority."  (Doc. 36 at 19).   However, Plaintiffs concede that the temporary reassignments[20] involved no unfavorable outcomes, and no loss in pay or other benefits.

Similarly, Triplett's "satisfactory" May 27, 2009 evaluation does not constitute adverse action, because it did not impact her wages or professional advancement.  *See Vaughn v. Louisville Water Co.*, 302 Fed. Appx. 337, 348 (6th Cir. 2008).  In addition, Lt. Miller offered unrebutted testimony that he never rated anyone under his supervision as "above target" during the time period that SOCF utilized the particular evaluation form of which Triplett complains.  (Miller Depo. at 84).

Three of the listed acts of "retaliation" involve instances in which Plaintiffs received "corrective counseling" for allegedly minor offenses for which males were not disciplined.   Setting aside the issue of whether such "counseling" (an admittedly non-

---

[20]At oral argument, Plaintiffs' counsel continually focused on the incident in which Triplett was removed from her post and reassigned for approximately a year and a half pending an investigation which ultimately exonerated her.   However, that incident occurred in 2006, well before December 2008, when Triplett alleges in her complaint that the discrimination against her began.

punitive action that does not appear in an employee's disciplinary file) could constitute retaliation, in this case the Plaintiffs have failed to offer any evidence that male correctional officers were not counseled for similar offenses. Absent such evidence, the provision of counseling for admitted violations of established rules cannot be considered adverse action.

Triplett further argues that the temporary removal of her desk and telephone on March 8, 2010 was retaliatory, because it placed her safety at risk. At oral argument, she asserted that the action was intended as intimidation, to show that Defendants had the power to eliminated Plaintiffs' jobs, safety, and security. As support for her belief that the removal of the desk was a planned "intimidation" tactic, Plaintiff relies upon an ambiguous reference on the Topix website. At oral argument, counsel represented that the planned removal of the desk and/or the "brimstone" language on the calendar in Triplett's work area was discussed on Topix "the day before" those events. However, Plaintiffs' evidence does not precisely match the representations made at oral argument.

For example, in the alleged transcript of the chat room conversation filed by Plaintiff, dated February 26 (year unknown, but presumed 2010), someone named Dreamweaver wrote:

> Hey Chance is it true that she threw her so called friend on third shift to the curb grapevine says that the queen viper was going to have her job cut but to save her own job she her friends job out there that the administration needed to cut the podium job instead of hers? That isn't cool to do to your so called friend but like everyone knows thats the vipers MO. [sic].

41

Plaintiff suggests that this Topix conversation refers to the elimination of Messer's post three months earlier, on October 29, 2009.  Messer was stationed at a new post beginning November 2009 until her resignation in June 2010.  Answering the Topix query, the person identified as Chance responded:

> yeah friday her job was to be cut monday her friends' (if she has any) is there any truth that their going to remove her desk to have her stay on her job at the podium. also heard that she was seen going out towards northwest after work i wonder who lives out that way (al) maybe. [sic].

(Doc. 39-4 at 2-3, punctuation and spelling errors original).  Given the timing (three months after Messer's post was included for elimination, and twelve days before the alleged March 8, 2010 removal of Triplett's desk) and context, it is unclear whether the reference to the desk concerned the elimination of the friend's "podium job," or the "viper's" desk.

In contrast to Plaintiffs' ambiguous Topix web site evidence, Defendants cite to evidence that the desk and phone were temporarily removed for repairs, that there were other telephones available, that Triplett wore an alarm at all times, and that Triplett was satisfied with the resolution of her grievance when the telephone and desk were replaced after a short time period.

Although Triplett also suggested at oral argument that the "brimstone" and "foul odor" comments were discussed on the Topix website the day prior to the date those comments appeared on a work calendar near her desk, Plaintiff's own exhibit does not confirm that timing.  Triplett's exhibits include an additional chat room transcript dated February 26 (presumed 2010) from Topix.  In that transcript, unknown persons discuss

42

a female "queen viper" who works in "visiting" at SOCF – according to Plaintiffs, a reference to Triplett.   A person identified as "fly on the wall" states that he/she overheard a visitor "stating that she had a wonderful visit today that old woman with no neck wasn't there."  In response, someone identified as "chance" states: "gee the queen viper must not of been there, but then again i didn't smell brimstone and hear hate coming out of the visiting room when i left." [sic].    (Doc. 40-1 at 3, punctuation and spelling original).  The similar notations made on the calendar near Triplett's work area did not appear the next day, but some 9 months later, on November 27, 2010.

In short, Miller's alleged July 2009 "bitch" comment (which Plaintiffs learned of second-hand), the desk/phone removal in March 2010, and the November 2010 notes discovered by Triplett on a calendar near her work area, do not constitute the type of adverse employment action that would support a retaliation claim.

Plaintiffs rely heavily on the "probable cause" determination by the OCRC that they were subjected to retaliation.  However, while the factual content of that report may be considered, the OCRC's legal conclusions are not binding on this Court.  *See e.g., Murray v. Kaiser Permanente*, 52 Fed. Appx. 725, 727 (6th Cir. 2002)(A determination by the Ohio Department of Jobs and Family Services cannot be given any preclusive effect in a subsequent suit filed under Title VII.).

In the end, Plaintiffs' best evidence of an "adverse action" concerns the abolishment of Messer's post in the visiting area in the 2009 layoffs.  As explained below, however, this evidence still falls short of what is required to defeat summary judgment.

Defendants argue that Messer's position was not abolished until more than five months after her first OCRC charge, but Plaintiffs have produced temporal evidence which, if believed, strongly supports an inference that the action would not have been taken had Plaintiffs not filed a complaint of discrimination.  The OCRC investigator determined that Messer's post was not on a list of those posts to be abolished until the very day that both Plaintiffs were absent from the facility for the purpose of meeting with an EEO officer in Dayton, Ohio.  Thus, there is at least some evidence that Defendants were aware of the meeting and specifically timed the change in the list of positions to be abolished to coincide with Plaintiffs' absence.

At oral argument, Defendants represented that additional evidence reflected that Defendants did not receive and approve the request from Plaintiffs to be absent from the facility until October 30, 2009 – the day *after* Plaintiffs' absence and the date that the new list of posts to be eliminated was finalized.   Defendants stated that Messer's post was discussed as a possible target for elimination prior to October 29, 2009, and that the finalization of the list including Messer's position on October 29 was purely coincidental.   However, Defendants have failed to provide the Court with any specific citations to that evidence, either at oral argument or in their memorandum in support of summary judgment.

Defendants do cite to Messer's testimony that she blames the Union's lack of opposition for the abolishment of her position, (*see* Messer Depo. 273) to argue that she cannot simultaneously contend that it was the Defendants who took the "adverse action."  However, the Union's alleged acquiescence does not insulate the Defendants'

44

adverse decision from all retaliatory motive.  Defendants have failed to cite to evidence showing any legitimate and nondiscriminatory basis for the last-minute timing of their decision to eliminate Messer's post, suggesting pretext.

Despite the suggestion of pretext, Defendants are entitled to summary judgment because Messer suffered no loss in pay or benefits from the abolishment of her post during the reduction in force, and there is no proof that the new post to which she bid offered fewer opportunities for advancement.  Therefore, the abolishment of her post does not appear to have been a "materially" adverse action.  "Not every act affecting an individual's employment can be considered an adverse, retaliatory action giving rise to liability."  *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d at 736 (citing *Ellerth*, 524 U.S. at 761).

### F.   Additional Grounds for Dismissal of Claims And Defendants[21]

#### 1.  Failure of Service

Warden Kerns was the SOCF Warden who immediately preceded Morgan. According to Defendants, Kerns retired from ODRC on or about June 30, 2010.  In a footnote in their motion for summary judgment, Defendants seek dismissal of all claims against Kerns in his individual capacity based upon Plaintiffs failure to service that Defendant.  (Doc. 31 at 12, n.1).   Plaintiffs do not respond to this argument.

Plaintiffs' second amended complaint also refers to John/Jane Does, but Plaintiffs have never identified those defendants by name, or attempted to obtain

---

[21]Although Defendants briefly presented oral argument on these alternative bases for judgment in their favor, as well as on the immunity issues discussed in the next section of this R&R, Plaintiffs offered no oral argument in response.

service.  Therefore, both Defendant Kerns and all John/Jane Does should be dismissed for failure of service.

### 2.  No Supervisory Liability Under Title VII

The Sixth Circuit has held that "Title VII does not create individual liability for individuals in supervisory positions."  *Akers v. Alvey*, 338 F.3d 491, 500 (6th Cir. 2003); *see also Wathen v. General Electric Co.*, 115 F.3d 400, 404-06 (6th Cir. 1997). Defendants seek summary judgment for the individual supervisors on this basis.  In response, Plaintiffs offer the conclusory argument – without citation to either record evidence or case law - that "Defendants Warden Morgan and Lt. Miller are clearly policy makers for SOCF," such that the claims against them "are claims against the agency itself."  (Doc. 36 at 20).  To the extent that Plaintiff has attempted to name individual supervisors, they clearly are not "employers" subject to liability under Title VII.  *See, e.g., Robbins v. Columbus Hosp.*, LLC, 2011 WL 221879 (Weber, J., granting partial summary judgment to individual defendants on Title VII claims).  For that reason, Defendants Morgan and Miller are entitled to judgment as a matter of law for all Title VII claims brought against them as individuals.

Although "supervisors and managers may be held liable for violations of Ohio Rev. Code §4112," *see id.*, at *3, the undersigned recommends the dismissal of Plaintiffs' state law claims against Morgan and Miller based upon sovereign immunity, as discussed below.

### G.  Immunity Issues/ Failure to State a Claim

#### 1.  ADEA

46

In addition to the arguments previously addressed, Defendants argue that because States are immune from suit for monetary damages under the ADEA, *see Kimel v. Florida Bd. Of Regents*, 528 U.S. 62 (2000), Defendants are likewise immune to the extent Plaintiffs have named any State entity or individual Defendant in his official capacity. Defendants further contend that Plaintiffs' ADEA claims against any individual Defendants in their individual capacities must be dismissed because, like Title VII, the ADEA does not provide for individual liability against supervisors or managers. *See, e.g., Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996). Aside from a general argument that they have satisfied legal prerequisites to filing this lawsuit by first filing charges with the OCRC and the EEOC, (Doc. 36 at 20), Plaintiffs fail to respond to these ADEA arguments. However, as the undersigned has already recommended dismissal of all age-based discrimination claims for lack of evidence, it is unnecessary to address the additional arguments.

### 2. Ohio Law

Plaintiffs' claims under state law are barred by the doctrine of sovereign immunity under the Eleventh Amendment, to the extent that Plaintiffs seek monetary damages against SOCF or any other State Defendant. *See, e.g., Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). Ohio has waived its sovereign immunity only as to actions filed in the Court of Claims of Ohio. O.R.C. §2743.02; *see also Leaman v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 825 F.2d 946, 954 (6th Cir. 1987)(*en banc*), *cert. denied*, 487 U.S. 1204 (1988). Similarly, Ohio state law claims against the individual defendants, including Defendants Morgan and

Miller, are barred by the civil immunity granted under O.R.C. §9.86, absent a determination by the Ohio Court of Claims that the immunity has been forfeited pursuant to O.R.C. §2743.03(F); *Haynes v. Marshall*, 887 F.2d 700, 705 (6th Cir. 1989).

### III.  Conclusions and Recommendations

For the reasons discussed above, **IT IS RECOMMENDED THAT** Defendants' motion for summary judgment (Doc. 31) be **granted,** that all claims against all Defendants be dismissed, and that this case be **closed.**


 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

48

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TONYA MESSER, et al.,                                    Case No. 1:11-cv-246

              Plaintiffs,                          Weber, J.
     v.                                           Bowman, M.J.

STATE OF OHIO,
SOUTHERN OHIO
CORRECTIONAL FACILITY, et al.,

            Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).