**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**TONYA MESSER, et al.,**

        **Plaintiffs**

        **v.**                **Case No. 1:11-cv-246-HJW**

**STATE OF OHIO/SOUTHERN OHIO
CORRECTIONAL FACILITY, et al.,**

        **Defendants**

## ORDER

      Pending is the defendants' "Motion for Summary Judgment" (doc. no. 31), which plaintiffs oppose. The motion was referred to the Magistrate Judge, who issued a "Report and Recommendation" (doc. no. 52), recommending that summary judgment be granted on all claims. Plaintiffs filed objections (doc. no. 56), and defendants responded (doc. no. 59). The parties also filed supplemental briefs regarding recent United States Supreme Court decisions (doc. nos. 61, 62). This Court heard oral arguments on August 6, 2013. Upon a *de novo* review of the record, including the parties' briefs, exhibits, objections, oral arguments, and applicable authority, the Court will <u>overrule</u> the objections and <u>grant</u> the motion for summary judgment on all claims, for the following reasons:

## I. Background and Procedural History

      Plaintiffs Tonya Messer and Anita Triplett worked as correctional officers at the Southern Ohio Correctional Facility ("SOCF") of the Ohio Department of

Rehabilitation & Correction ("ODRC"). SOCF is a maximum security prison for adult felony offenders. Triplett began working at SOCF on June 6, 1988, and Messer began working there on November 28, 1994. At the times relevant to this lawsuit, plaintiffs worked in the "Mail and Visiting Department" which consisted of the mailroom and prisoner visiting room (Triplett Dep. at 15; Messer Dep. at 28). Four correctional officers were assigned to each room (Messer Dep. at 32). As part of their mailroom duties, plaintiffs screened prisoner mail, which included a substantial amount of pornography, to ensure it was not "overly explicit" and did not contain contraband (Messer Dep. at 150; Triplett Dep. at 111, 131). A male "shakedown" officer conducted strip searches of inmates before and after visits.

Triplett clashed with various co-workers, both male and female. In 2006-2007, the record reflects that a female corrections officer (CO Dorene Booker) complained about Triplett's offensive behavior, Triplett admittedly called the prison chaplain a "fat ass," and Triplett was disrespectful to her supervisor Lt. Belford (doc. no. 25-17 at 7). While SOCF investigated these complaints, Dep. Warden Morgan removed Triplett from her mailroom post. The female investigator Labor Relation Officer ("LRO") Lisa Haynes found that Triplett had committed all three infractions. Specifically, after a pre-disciplinary hearing, the investigator found that Triplett's behavior reported by CO Booker was "offensive" and had created a "hostile working environment" in the Mail and Visiting Department, that Triplett also made "a statement in front of an employee calling another employee a fat ass," and that "it was also found that you were disrespectful to your

supervisor" (doc. no. 25-17 at 7). After "corrective counseling," Triplett was allowed to return to her mailroom post on December 10, 2007. Triplett admits that corrective counseling is not considered discipline (Triplett Dep. at 86, 145 "I know corrective counseling is not discipline").[1] Prior to Triplett's return, Messer indicates she had no problems with her coworkers and that the other officers just "did their job" (Messer Dep. at 39).[2]

Several months later, on May 19, 2008, several correctional officers (Donald Ferguson and Doug Kraft) notified supervisors at SOCF that Triplett had been making crude and profane comments about female corrections officers (whom she referred to as "stupid bitches" and "cunts") having sexual relations with inmates, allegedly in reference to Ferguson's wife, who was a former correctional officer at SOCF (doc. no. 25-23 at 1-2, Incident Report). Ferguson and Kraft were present in the mailroom when Triplett made the offensive comments in front of other

---

[1] Triplett inaccurately asserts in her objections that she was "exonerated" on these "false charges" (doc. no. 56 at 12). On the contrary, the female investigator specifically found that Triplett had committed all three infractions (doc. no. 25-17 at 7). Triplett signed and acknowledged the report. At deposition, Triplett further acknowledged her conduct (Triplett Dep. 145, Q: Did you call another employee a fat ass? A: Yes.). She acknowledges that she was "correctively counseled" for her misbehavior (Triplett Dep. 22-24, 143-45). The fact that these matters were handled by means of a "pre-disciplinary hearing and corrective counseling" does not mean she was "exonerated."

[2] The Magistrate Judge declined to consider the events in 2006-2007 because plaintiffs' complaint alleges discrimination beginning in December 2008. Plaintiffs object that the earlier events "may have been beyond the statute of limitations for damages, but . . . should have been considered in order to establish defendants' . . . discriminatory intent" (doc. no. 56 at 3). The Court has considered the earlier events to the extent they provide context for plaintiffs' claims.

correctional officers, including some new female officers. In his incident report, Ferguson complained that Triplett was "always making these kinds of statements" and that Triplett's comments were creating a "hostile working environment" (Id.). Lt. Tammie Kitchen investigated the matter.[3]

In her written report, Lt. Kitchen indicated that Triplett admitted making the comments, but claimed she did so to "warn" the new officers about "how easily the inmates can talk a staff person into bringing in drugs or have affairs with them" (doc. no. 25-23 at 3). At deposition, Triplett confirmed that she made the comments (Triplett Dep. at 127). Lt. Kitchen's report indicated in the "plan of action" that "Officer Triplett will be professional at all times and will not use profanity in the presence of other employees." Ultimately, Dep. Warden Morgan and Lt. Kitchen did not take any further action or impose "discipline" because Triplett had not referred to Mrs. Ferguson specifically by name (doc. no. 25-23 at 1).[4]

---

[3] Lt. Kitchen noted in her report that when she returned from leave to investigate the complaints about Triplett, the documents were "missing" from her desk drawer in the visiting area. This suggests the possibility that someone may have taken the documents in order to thwart the investigation. Regardless, Lt. Kitchen was able to obtain duplicates of the documents reporting Triplett's misbehavior.

[4] It is unclear why this made any difference, given that Triplett's expletive-filled comments were obviously intended to offend and irritate CO Ferguson, whose wife had lost her corrections job after inappropriate contact with an inmate. After Ferguson showed restraint (i.e. he made no response and left the room), Triplett reportedly further commented to other officers that "I can't believe he didn't have the balls to defend her" (doc. no. 25-23 at 4, 2nd Incident Report). Such comment would have no valid purpose with respect to "warning" new hires about inappropriate contact with inmates and indicates that Triplett was deliberately being offensive to Ferguson. Triplett's crude comments would also have been offensive to other officers, including the new hires. She could "warn" them about

4

On January 1, 2009, Lt. Nathanial Miller became the "special duty supervisor" responsible for supervising approximately 95 correctional officers in various areas, including those screening pornography in the mailroom.[5] Lt. Miller was a 27-year ODRC veteran with a clear record of no disciplinary violations. Shortly thereafter, Triplett and Messer complained to him that their mailroom co-worker CO Kraft was not doing his work and that CO Ferguson was sleeping on the job (Miller Dep. 34-37). Plaintiffs did not complain to him about the workplace being "intolerable" or about any "sexual gestures, signs, or things of that nature" (Id. at 26). Lt. Miller indicates that he asked the investigators to watch the security cameras that viewed the posts where Kraft and Ferguson were working and that he also personally observed them at work for "a week or two," but could not substantiate any allegations about deficiencies in their job performance (Id. at 32-37 "they just acted appropriately and did their job").

Not satisfied, Messer went over Lt. Miller's head and complained to Warden Phillip Kearns, the EEO Chairman Larry Green, and the EEO Women's Coordinator Kathy Jones in a meeting on March 3, 2009. Messer indicates she complained of "how we were doing the work, how guys was just sitting around not doing their work . . . people not doing their job, people -- the cameras being on us, the – Donny Ferguson not wearing his alarm . . ." (Messer Dep. at 182-83). She does not recall

inappropriate inmate contact without using vulgar profanity.

[5] Lt. Miller was aware that Triplett had clashed with co-workers, including the "well-known feud" that she had with CO Bern Orthmeyer "who ultimately left." According to Lt. Miller, Triplett claimed she had "run him off" (Miller Dep. at 124).

5

telling the warden that she thought she was being discriminated against (**Id**. "I told him that -- I told him that – I didn't use discriminated, I don't think. I don't remember."). She did not recall saying anything about being treated differently due to "age," but believes she mentioned "the good old boys system" (**Id**. at 184). The Warden called Lt. Miller to ask about Messer's allegations.

In a March 4, 2009 email, Lt. Miller advised Capt. William Cool, Special Duty Commander, that Messer had complained to the warden without ever officially reporting any issues. He indicated this was a continuation of Triplett's attempt to undermine his authority because "I won't allow her to run the Mail/Visiting Department" and that "I believe she is the root of a majority of the issues in the area and would like to use this as a first step in the process of eroding her power and influence over the herd" (doc. no. 37-3). A copy of the email was sent to the warden. Lt. Miller had a staff meeting and handed out a letter with the administrative rule concerning the duty to report unusual incidents promptly and within the chain of command, but Messer "grieved" the matter and met with the Warden again on March 16, 2009. The Warden had an "open door" policy, meaning that employees were allowed to speak with him about alleged "discrimination or harassment," and Messer's union representative apparently characterized Messer's discussion with the warden as this type of complaint. Messer's grievance was settled (doc. no. 37-4 at 3).

On May 9, 2009, plaintiffs both filed complaints with the Ohio Civil Right Commission ("OCRC"), alleging "discrimination and sexual harassment . . . since

December 2008" (doc. no. 15, Exs. A, B). Messer checked the boxes indicating she believed she was discriminated against because of her sex, age, and in "retaliation" for "making EEO complaint" (Id.). The latter is apparently a reference to her March 3, 2009 meeting with the Warden and EEO officers. As for the "type of discrimination," she checked "harassment" and "other" (described only as "other terms and conditions of employment"). In a rambling narrative, she complained of various incidents, most of which she had never reported. For example, she complained that on March 23, 2009, she was assigned to AVI detail and afterwards to the mailroom, and that CO Baumont had not done the legal mail and therefore Messer had to do it (doc. no. 15-1 at 4).[6] She referred to incidents on December 2-4, 2008 which allegedly concerned supervisors using "overtime" to fill a post, when in her opinion, "the overtime is not needed" (Id. at 2).[7] Messer complained that unidentified male co-workers on unspecified dates had referred to female officers as "bitches," "cows," or "snakes," and that on unspecified dates, she had received anonymous phone calls making moo or hiss sounds. She indicated she had complained to Lt. Dave Porter and Capt. William Cool, but that "no action was taken." (Id.). She alleged that the security cameras in the visiting room were "aimed" at her and Triplett for several days and that "Lt. Miller told me several

---

[6] Messer testified that she could not recall if she ever reported or grieved this alleged incident (Messer Dep. at 208).

[7] In Triplett's exit survey, she contradicted Messer's prior allegation by indicating that she "strongly agreed" that "overtime policy was followed" at SOCF (doc. no. 25-18 at 8, ¶ 12).

times to get on my post" whereas a younger male officer did not have on his belt or alarm, was "falling asleep on the job," and was not disciplined (Id. at 5).

Triplett's charge on the same date was substantially similar (doc. no. 15-1, Ex. B). In fact, much of her narrative is verbatim of Messer's narrative. Additionally, she complained that "in the email Lt. Miller also blamed me for the issues and stated that he would erode me of my power," apparently an ungrammatical reference to Lt. Miller's email in which he indicated that Triplett was attempting to undermine his authority. Triplett complained that the Warden did not "require an apology from Lt. Miller" (Id. at 8). She alleged that Lt. Miller had "caused" the security cameras to be focused on their desks. Like Messer, she complained that CO Ferguson was not disciplined for allegedly falling asleep on the job and for "working without a belt or an alarm."

On May 27, 2009, Lt. Miller prepared annual evaluations and despite Triplett's occasional performance issues, gave her a "satisfactory" rating. Triplett appealed this rating, claiming she should have had a "perfect" rating (Tripplett Dep. at 200). Satisfactory evaluations cannot be challenged at SOCF, as they do not affect pay, benefits, or any other condition of employment.

On May 29, 2009, plaintiffs filed a grievance alleging that 2 of the 3 cameras had been aimed at the visiting room "west desk" where Messer had been working (doc. no. 23-26). On June 5, 2009, the Warden responded that two investigators had been "monitoring Ferguson" *as plaintiffs had requested*, that the cameras had been focused on that location since their request, and that the cameras were "now

8

moved to another location" (Messer Dep. at 213, 219). Plaintiffs acknowledge that Lt. Miller had no control over the placement of the cameras and that he could legitimately observe work areas and employees under his supervision (Messer Dep. at 94-95, 111; Triplett Dep. at 34, 194). The grievance was withdrawn.

On May 30, 2009, Messer reported that someone had rearranged the movable letters on a small sign in the mailroom to read "Matey I Luv Cooterz Pawn" (doc. no. 37-6 at 1). Plaintiffs contend that "cooterz" is a reference to female genitalia. The mailroom is closed on Saturday, and plaintiffs were not working there that day. In fact, Triplett indicates she never saw the sign and only learned of it later from Capt. Bell's incident report (Triplett Dep. at 36). Upon seeing the sign when he returned to work Monday morning, Lt. Miller took it down immediately. He spoke with the correctional officers in the area, but none of them admitted rearranging the letters. He sent a written memo, with the official anti-harassment policy attached, to all officers in the area, warning them that "harassment of any kind will NOT be tolerated" and directing that "there will be no offensive materials, signs, or photos displayed in any work area" (doc. no. 29-8 at 1). Despite this, Lt. Miller received a two-day suspension over the incident for "failing to supervise" the mailroom (Miller Dep. at 122).[8]

On June 10, 2009, Triplett reported that she saw CO Kraft dance, make faces, and spank himself on his butt while looking at her, which she described as

---

[8] Contrary to plaintiffs' objection that the Magistrate Judge "disregarded" this incident. the Magistrate Judge discussed and considered it (doc. no. 52 at 8, 23).

childish "Beavis and Butthead" behavior (doc. no. 39-2 at 1). She reported that he allegedly did things like this on several occasions (Triplett Dep. at 37, describing Kraft's behavior as "just a whole array of just comedy act"; Messer Dep. at 115 "just throwing his arms around, smiling, laughing"). She indicates she spoke with Capt. Bell about it and filed several reports about it.

On June 17, 2009, Lt. Miller made two phone calls to the area "wanting to know where CO Hiles was." Triplett answered one of the calls; Messer did not answer any calls (Messer Dep. at 216). Although plaintiffs both acknowledge that it is a supervisor's job to know where the officers are at all times in a prison, plaintiffs contend that Lt. Miller had sent CO Hiles for training and an EEO test, and therefore in their opinion, Lt. Miller "knew" where CO Hiles was and that he was just "harassing" them (Triplett Dep. 205; Messer Dep. at 217-18). Both plaintiffs filled out an "incident report" claiming that Lt. Miller was thereby subjecting them to a "hostile work environment" (doc. no. 25-35, Ex. 23). Given plaintiffs' allegation of a "hostile work environment," the warden removed them from their post on June 18, 2009 for approximately one week while the matter was investigated. Triplett acknowledges that this was appropriate (Triplett Dep. at 43-44 indicating the warden "couldn't allow us to keep working in a hostile work environment").

Meanwhile, Lt. Miller went to Dep. Warden Morgan and asked to move to the evening shift to get away from the "intense pressure" of being "expected to supervise a shift with hostile employees" (Miller Dep. at 25-26, 107 indicating that

10

Triplett "revels in her open insubordination" toward supervisors).[9] The Warden advised plaintiffs on June 23, 2009, that Lt. Miller had been reassigned and would not be their supervisor in the Visiting Area (Triplett Dep. at 49-50, 209). Plaintiffs indicated they were comfortable returning to their posts and did so on June 29, 2009. Their grievances were withdrawn (doc. no. 38 at 7). Plaintiffs nonetheless filed more grievances on August 11, 2009, complaining about their temporary removal from their posts during the investigation and complaining that Lt. Miller was "still working special duty" on Mondays, which according to plaintiffs, affected their ability "to work their bid posts" (doc. no. 38 at 1, 4). As the Visiting Area was closed on Mondays, and as Lt. Miller had moved to another post on the evening shift as of August 16, 2009, it was determined that he was "no longer supervising the area" (Id. at 3, 6).[10] The grievances were withdrawn (Id. at 7).

   In August of 2009, the Ohio Department of Rehabilitation & Corrections notified SOCF employees that the number of correctional officers was being reduced to 501, thus requiring the elimination of twelve positions from the Union's "Pick-a-Post" agreement. A total of 175 positions were being reduced statewide. On October 29, 2009, Triplett and Messer used leave and went to the Dayton OCRC office, which coincided with the formal posting of the ODRC's list of "Proposals"

---

[9] Triplett testified that "we would call on Mondays to get our job assignment," but refuse to speak with Lt. Miller and "just hang up" on him (Triplett Dep. at 60-61). She admits did this "maybe four, five times." She indicated he did not supervise her in any other way during the period 6-23-09 through 8-16-09. (Id. at 62).

[10] Triplett indicates she typically worked from 8:30 a.m. to 4:30 p.m. (doc. no. 39 at 2) or "8:00 a.m. to 4:00 p.m." (doc. no. 25-18 at 5).

for how the staff reductions might occur. Multiple proposals were listed, including "Proposal F," which suggested that the prison could "combine South Visiting Desk and Shakedown Officer" (doc. no. 37-2 at 7). Although Proposal F initially listed Triplett's post, a subsequent revised list eliminated Messer's post instead. Plaintiffs filed charges on November 10, 2009, claiming that they were being "retaliated" against for prior EEO complaints because their posts were listed (doc. no. 15-3 at 1-2, Ex. K, L). Messer then took FMLA leave for psychological problems from Nov. 21, 2009 until Jan. 15, 2010 (Messer Dep. at 251).

On March 8, 2010, the south desk and phone were temporarily removed after an officer reported that the desk had a broken leg and the phone was not working. Defendants indicate that other phones were available in the area. Triplett complained about the removal of these items. The desk was repaired and returned several days later on March 11, and a new phone was installed on March 16 (Triplett Dep. Exs. 41-42). She was so pleased with Lt. Ison's response to her complaint that she wrote an incident report praising him (Triplett Dep. Ex. 42).

On April 12, 2010, Triplett called in sick, but refused to speak with Lt. Miller, who was handling such calls on his shift (Miller Dep. at 24 "my assignment was in control center one, and it was my job to finish the call-offs"). Triplett admittedly hung up on him and then circumvented proper procedures by obtaining the required information from another officer who lacked the authority to give out such information. Lt. Miller wrote Triplett up for violating call-in procedures, and she was "correctively counseled" about this matter.

On May 3, 2010, Triplett was temporarily reassigned while SOCF investigated multiple complaints by visitors that Triplett had been rude to them (Triplett Dep. at 45, 87, Exs. 52, 53). Triplett filed a charge on May 17, 2010 (doc. no. 15, Ex. C), complaining about being removed from her post in the visiting area while SOCF investigated the complaints. She also claimed that her write-up for violating call-in procedures amounted to "discrimination and retaliation." On June 22, 2010, Linnea Mahlman, SOCF Institutional Inspector, issued her report containing interview summaries and detailed findings (Triplett Dep. Ex. 55). Inspector Mahlman indicated that "I believe that Officer Triplett was rude with visitors and recommend disciplinary action" (Id., Ex. 55 at 23). Ultimately, Dep. Warden Morgan did not discipline Triplett and indicated she could return to the Visiting Area. Instead, plaintiffs both "bid" on and received other posts with no change in salary or benefits. Triplett requested to stay in the "K5 Utility" area where she had been working during the investigation. Her request was granted, and she was reassigned to K Block, escorting medical personnel (Triplett Dep. at 14, 72). Messer also moved to this area (Messer Dep. at 15 "it was control four in K corridor . . . at the beginning of K Block"). Messer indicates that, like the mailroom, she could sit in a chair for this job (Id. at 211).

Subsequently, on June 22, 2010, Messer submitted a resignation letter, indicating the effective date of her resignation was June 16, 2010 (doc. no. 38-4 "Please accept this as my formal resignation from service at . . . SOCF"). Triplett continued to work at SOCF for another six months. On September 29, 2010, she

filed a fourth EEOC charge (doc. no. 15, Ex. D) complaining that "the inmates and some corrections officers were discussing and spreading rumors about me and a male Lt. Ison having dinner together and going shopping" and that "the Warden then called Lt. Ison to see if it were true" (doc. no. 15-1 at 12). She checked the boxes for sexual harassment and retaliation, and alleged in her narrative that the rumors of her affair with Lt. Ison created "a hostile working environment" (doc. no. 25-77, Triplett Dep. Ex. 65). Triplett blamed unspecified inmates and co-workers for the rumors, but later withdrew this charge (Id. at 267). On November 27, 2010, Triplett contends she noticed several words (e.g., "foulness" and "fire & brimstone") written on the south desk calendar in the visiting area, which she interprets as "harassment" by an unknown person, even though she was now working in a different area of the prison (Id. at 88-90). On December 16, 2010, Triplett "resigned," but subsequently sought, and was approved, for voluntary disability retirement, effective August 25, 2011.[11]

---

[11] As the Magistrate Judge noted, Triplett's employment status at SOCF for the months between her resignation and voluntary disability retirement is unclear. SOCF records indicate that Triplett was "off work since December 26, 2010 due to a disabling medical and/or psychological condition" and that she had obtained disability leave benefits (doc. no. 25-18 at 11). Triplett includes some psychiatric records among her exhibits (see doc. no. 38-5 at 2, "Progress Notes/Mental Status Exam" in 2009 by Dr. Sid Y.C. Shih, M.D., of Ashland Psychiatry Associates, indicating that Triplett was "doing OK" but had "intermittent depressive episodes" and was "deficient" in both judgment and insight). SOCF granted Triplett's request for a "voluntary disability separation" on August 24, 2011, effective the next day (Id. at 11-12). She began receiving benefits on October 1, 2011.

On January 27, March 25 and April 19, 2011, the EEOC and/or DOJ responded to counsel's request and issued overlapping "Dismissal and Notice of Rights" letters to each plaintiff for their respective charges (doc. no. 15 at Exs. E-J). On April 21, 2011, plaintiffs filed a five-count federal complaint, alleging age and sex discrimination, disparate treatment, hostile work environment, and retaliation, under state and federal law. In their Second Amended Complaint, plaintiffs sued SOCF,[12] former-Warden Phillip Kearns, Warden Donald Morgan,[13] and Lt. Nathanial Miller (doc. no. 15). Plaintiffs attached copies of their charges (Exs. A-D, K, L) and the corresponding "right to sue" letters (Exs. E-J, M, N).

After discovery concluded, the defendants moved for summary judgment (doc. no. 31). The Magistrate Judge recommended that summary judgment be granted on all claims (doc. no. 52). Plaintiffs filed objections, and defendants responded (doc. nos. 56, 59). Several "supplemental briefs" were also filed (doc. no. 61, 62). This matter is fully briefed and ripe for consideration.

## II. Review of Objections

The Magistrate Judge Act, 28 U.S.C. § 631 et seq., provides for *de novo* review by the district court when a party timely files specific written objections. Generalized objections that do not "specify the issues of contention" are not sufficient to satisfy the requirement of specific objections. Miller v. Currie, 50 F.3d

---

[12] Although plaintiffs named the prison as a party, the defendants point out that the real party-in-interest is the ODRC (doc. no. 3 at 1, fn.1).

[13] Warden Kearns retired on June 30, 2010; Deputy-Warden Morgan became the new Warden on April 11, 2010.

373, 380 (6th Cir. 1995); <u>Howard v. Secretary of HHS</u>, 932 F.2d 505, 508-09 (6th Cir. 1991). Simply restating prior arguments does not amount to a "specific objection." See, e.g., <u>Holl v. Potter</u>, 2011 WL 4337038 (S.D.Ohio); <u>Harris v. Morgan</u>, 2012 WL 2505838 at *3 (N.D. Ohio) (an objection that merely "summarizes what has been presented before" is not a "specific objection"). In large part, the plaintiffs' objections merely restate facts and prior arguments. Despite the generality of the objections, the Court has conducted *de novo* review and agrees with the Magistrate Judge's recommendation that plaintiffs have not made out prima facie cases of discrimination or retaliation. As plaintiffs did not object to the additional grounds for dismissal (i.e., immunity, no individual liability) discussed by the Magistrate Judge, those additional grounds will not be discussed.

### III. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides in relevant part:

> A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Rule 56(c)(1) further provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

The moving party bears the burden of proving that no genuine issue of material fact exists. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 586 (1986). The court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. <u>Id</u>. at 587. In doing so, courts must distinguish between evidence of disputed material facts and mere "disputed matters of professional judgment," i.e. disagreement as to legal implications of those facts. <u>Beard v. Banks</u>, 548 U.S. 521, 529 30 (2006).

On summary judgment review, the court must determine whether the evidence presents a sufficient dispute of material fact so as to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 251-52 (1986). A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." <u>Id</u>. at 248. A mere scintilla of evidence in support of a party's claim is insufficient to survive summary judgment, as there must be enough evidence that a jury could reasonably find for the party. <u>Id</u>. at 252. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

<u>IV. Relevant Law</u>

    <u>A. Statutes</u>

The Age Discrimination in Employment Act ("ADEA") provides in relevant

part that "[it] shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA also contains an anti-retaliation provision which prohibits an employer from "discriminating against "employees ... because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. § 623(d).

Title VII of the Civil Rights Act of 1964 ("Title VII") provides in relevant part that an employer may not "discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits retaliation because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a).

Similarly, Ohio law makes it unlawful "[f]or any employer, because of the ... sex ... [or] age ... of any person ... to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio R.C. § 4112.02(A). Ohio law also makes it unlawful "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge,

testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." Ohio R.C. § 4112.02(I). Typically, resolution of the federal claims will resolve the state claims, as the same evidentiary standards and burdens of proof are applicable. See, e.g., Francis v. Davis H. Elliot Construction Co., 2013 WL 941527 (S.D.Ohio)).

### B. Evidentiary Burden-Shifting Framework

Employment discrimination and retaliation claims may be based upon direct or indirect evidence. Direct evidence is "evidence that proves the existence of a fact without requiring any inferences," Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548 (6th Cir. 2004), whereas indirect evidence requires the drawing of an inference. Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003).

For claims based on indirect evidence, the burden shifting evidentiary framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as modified by Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981), applies. A plaintiff must first establish a prima facie case of employment discrimination. Upon doing so, the burden shifts to the employer to "articulate a nondiscriminatory reason for its action." Harris v. Metro. Gov. of Nashville & Davidson Cty., Tenn., 594 F.3d 476, 485 (6th Cir. 2010). If the employer does so, the plaintiff must then rebut the proffered reason by pointing to sufficient evidence from which the jury may reasonably reject the employer's explanation as pretextual. Schoonmaker v. Spartan G. L., LLC, 594 F.3d 476, 264 (6th Cir. 2010). The ultimate question in every employment discrimination case is whether the

19

plaintiff was the victim of intentional discrimination. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 153 (2000).

Although the burden of production shifts, plaintiff retains the ultimate burden of persuasion at all times to prove by a preponderance of the evidence that age was the "but-for" cause of the employer's adverse action. <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 177 (2009). "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)." <u>Univ. of Texas S.W. Med. Center v. Nassar</u>, 570 U.S. --, 133 S.Ct. 2517, 2013 WL 3155234 at *14 (explaining that while a but-for causation standard is appropriate for Title VII retaliation claims, a but-for causation standard is not appropriate for status-based Title VII claims).

<u>V. Discussion</u>

<u>A. Only Admissible Evidence May be Considered on Summary Judgment</u>

Before proceeding, the Court emphasizes that only admissible evidence may be considered on summary judgment review. <u>Bailey v. Floyd Cty. Bd. of Ed.</u>, 106 F.3d 135, 145 (6th Cir. 1997) (explaining that "the proffered evidence need not be in an admissible form, but its content must be admissible"). Some of the evidence relied on by plaintiffs may not be considered on summary judgment review. For example, although plaintiffs attempt to rely on the EEOC's probable cause determination, this is "presumptively inadmissible because it suggests that preliminarily there is reason to believe that a violation has taken place and therefore results in unfair prejudice to defendant." <u>Schoonmaker</u>, 595 F.3d at 269.

Plaintiffs also rely on their own lengthy affidavits, which contain their own subjective beliefs, conclusory allegations, inadmissible hearsay, and assertions that contradict their prior deposition testimony. Supporting affidavits must: (1) "be made on personal knowledge"; (2) "set out facts that would be admissible in evidence"; and (3) "show that the affiant ... is competent to testify on the matters stated." Fed. R. Civ. Pro. 56(c)(4); Sperle v. Mich. Dept. of Corrections, 297 F.3d 483, 495 (6th Cir. 2002). Affidavits must be premised on firsthand observations or personal experience, as shown by specific facts. Buchanan v. City of Bolivar, 99 F.3d 1352, 1355 n. 2 (6th Cir. 1996) (affidavits based merely on the affiant's "belief" are not proper). "Affidavits composed of hearsay and opinion evidence do not satisfy Rule 56(e) and must be disregarded." State Mut. Life Assur. Co. of Am. v. Deer Creek Park, 612 F.2d 259, 264 (6th Cir. 1979). The Magistrate Judge correctly points out that "a conclusory affidavit that does little more than express a plaintiff's subjective belief that she was discriminated against in not sufficient to defeat summary judgment" (doc. no. 52 at 20-21).

The Magistrate Judge also correctly pointed out that plaintiffs are attempting to rely on various hearsay statements of others (doc. no. 52 at 23-24, discussing an alleged comment by Lt. Miller). Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing" which a party offers in evidence "to prove the truth of the matter asserted in the statement." Fed.R.Evid. 801(c). Courts may not consider inadmissible hearsay when ruling on a summary judgment motion. N. Am. Specialty Ins. Co. v. Myers,

21

111 F.3d 1273, 1283 (6th Cir. 1997). Plaintiffs bear the burden of proving that any hearsay fits within an exception. U.S. v. Arnold, 486 F.3d 177, 206 (6th Cir. 2007).

The Magistrate Judge indicated that "the affidavits are replete with vague allegations of discrimination and retaliation, some of which clearly contradict plaintiffs' prior deposition testimony" (doc. no. 52 at 18). A party may not create a genuine dispute of material fact by filing an affidavit which directly contradicts her earlier deposition testimony. Reid v. Sears Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986); Aerel, S.RL. v. PCC Airfoils, L.L.C, 448 F.3d 899, 908 (6th Cir. 2006). Absent a "persuasive justification for the contradiction," a court may disregard the conflicting portion of the affidavit. O'Brien v. Ed Donnelly Entrps., Inc., 575 F.3d 567, 593 (6th Cir. 2009); Aerel, S.R.L., 448 F.3d at 906-908. To the extent plaintiffs' affidavits contradict their prior deposition testimony, and to the extent they have not explained the contradictions, the Court may disregard those portions of the affidavits. For example, although Triplett denies making the 2006 statements (doc. no. 36-2 at 9, Aff. ¶¶ 35-39), she admitted to the investigator and at deposition that she made the statements (Triplett Dep. at 126-27, 144).

### B. Claims of Age and/or Gender Discrimination

#### 1. No Direct Evidence

Plaintiffs do not point to any direct evidence of age or gender discrimination. Triplett admits she never heard Lt. Miller or anyone else at SOCF call her any names or say anything about her age or gender:

Q. Did you ever hear Lieutenant Miller call you any

name?
A. No, I didn't go around him.
Q. Did you ever hear anyone at the institution call you a
name?
A. No.
Q. Did you ever hear anyone at the institution say
anything about your age?
A. No.
Q. Did you ever hear anyone at the institution say
anything about your gender?
A. No.

**(Triplett Dep. at 54-55).**

   **Messer also testified that no supervisor made any discriminatory remarks to**

her based on age or gender.

Q. Did any of your supervisors ever say that you were
being treated differently because of your age?
A. No, not that I recall.
Q. Did any of them ever say anything to you about your
age?
A. Not that I recall.
Q. Did any of your supervisors ever say that you were
being treated differently because of your gender?
A. No, not to me, they didn't.
Q. Did any of your supervisors ever say anything about
your gender?
A. No, not that I recall.
Q. Did you ever hear your supervisors say any
gender-based comments?
A. Like?
Q. Jokes.
A. Over the years I worked there, almost years, you hear
all kinds of gender-based jokes, jokes, laughing,
comments, yeah.
. . .
Q. Do you remember any specific instances?
A. No.

**(Messer Dep. at 198-199). The United States Supreme Court has explained that "the**

ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing are legally insufficient to obtain relief under Title VII." <u>Faragher</u>, 524 U.S. at 788.

Messer's allegations about any co-workers' comments are vague. Although she complains "mainly" about Kraft and Ferguson, she could not identify any specific discriminatory comments by Kraft (Messer Dep. at 154 Q: What comments would he make? A: ... I don't know what the comments. It was like mumbling. Saying something but not saying something for you to hear good, you know. It's just -- I don't know what the comments was. . . just little digs, just little irritating gestures, I guess. I don't know.). She identified no comments at all by Ferguson.

Despite generally alleging in her May 9, 2009 charge that she and Triplett had been called "snakes," Messer later recalled only a single incident on an unspecified date where a male co-worker (whose name she could not remember) allegedly referred to the visiting area as a "snake pit" (Messer Dep. at 97). The context of Messer's testimony makes it obvious that the comment was not a derogatory reference to age or gender. According to Messer, he told her "you need to go in there and work together with them guys. You need to end this. You need to quit causing all this racket." (<u>Id</u>.). Despite his conciliatory words, Messer responded in a hostile manner (<u>Id</u>. "I told him to get out of my face."). She later indicated that she might have had this conversation with CO Ron Mills, who did not work in the visiting area. She admits she never reported this or filed a grievance (<u>Id</u>. at 98). The only other express reference to a "snake" is when Triplett

apparently referred to *herself* as a "snake," apparently a reference to her ability to "strike back" at anyone she disliked (Miller Dep. at 105-07, 124-25).

Although plaintiffs also generally allege that they were called "cows" by male co-workers, this is based on a single reference in Lt. Miller's email to Triplett's influence "over the herd." Although plaintiffs attempt to imbue this innocuous comment with discriminatory animus, the comment was referring to a group of male and female officers and is age and gender neutral. Lt. Miller did not call them "cows." Although Triplett alleges that she learned "from someone else" that Lt. Miller had purportedly said "when this shit is over that bitch better retire" (Triplett Dep. at 54-55), Lt. Miller denies saying this, and it is undisputed that he was not her supervisor at the time (<u>Id</u>.).

Even assuming that these hearsay statements were somehow admissible, plaintiffs fail to explain how any of these comments directly relate to age or gender. Inferences would be required to interpret them as urged by plaintiffs, and thus, the alleged comments are not "direct" evidence of sex or age discrimination. Plaintiffs must proceed under the burden-shifting framework for claims based on indirect evidence.

### 2. Disparate Treatment Theory

To establish a prima facie case of employment discrimination under a disparate treatment theory with indirect evidence, each plaintiff must show that (1) she was a member of a protected class (i.e. female, over forty); (2) she suffered an adverse employment action; (3) she was qualified for her position; and (4) she was

replaced by someone substantially younger and/or male, or was treated differently than similarly situated, nonprotected employees. <u>White v. Baxter Healthcare Corp</u>., 533 F.3d 381, 391 (6th Cir. 2008), cert. denied, 129 S.Ct. 2380 (2009) (gender); <u>Geiger v. Tower Automotive</u>, 579 F.3d 614, 622 (6th Cir. 2009) (age). "When a plaintiff alleges disparate treatment, liability depends on whether .... the plaintiff's age ... actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." <u>Reeves</u> , 530 U.S. at 141.

The parties do not dispute that the plaintiffs were female and over forty, and that they were qualified for their jobs as corrections officers. Defendants contend that the plaintiffs have not shown that they suffered any "adverse action," i.e. that they were subjected to a "materially adverse change in the terms or conditions of her employment." <u>Kocsis v. Multi–Care Mgmt., Inc.</u>, 97 F.3d 876, 885 (6th Cir. 1996); <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742, 761 (1998). The employer's action must constitute "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>White</u>, 533 F.3d at 402 (quoting <u>Burlington</u>, 524 U.S. at 761)).

Plaintiffs have not pointed to evidence of any "materially adverse change in the terms or conditions of their employment" that would amount to an adverse employment action. The Magistrate Judge observed that "many if not most of the alleged incidents fall within the realm of petty slights and do not appear to bear any relationship to plaintiffs' gender" (doc. no. 52 at 22). For example, although

Triplett complains that she received a "satisfactory" evaluation rather than a "perfect" rating (Tripplet Dep. at 200), she suffered no loss of pay or benefits as a result. This does not amount to an adverse employment action. See <u>Tuttle v. Metr. Gov. of Nashville</u>, 474 F.3d 307, 322 (6th Cir. 2007) (even "a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary"), cert. denied, 552 U.S. 888 (2007); <u>Burlington</u>, 524 U.S. at 761 (citing <u>Flaherty v. Gas Research Inst.</u>, 31 F.3d 451, 456 (7th Cir. 1994) ("a bruised ego is not enough")).

Although Messer's post was eventually eliminated in a state-wide workforce reduction, she was never laid off (Messer Dep. at 232). As the Magistrate Judge correctly observed (doc. no. 52 at 10, fn. 7), neither plaintiff was scheduled to lose their jobs or benefits, because they "bid on," and were given, other posts with no loss of pay or benefits. They both retained their jobs as correctional officers at the same prison and were reassigned to other posts on the shifts they requested (Triplett Dep. at 14, 72; Messer Dep. at 15). "Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." <u>Kocsis</u>, 97 F.3d at 885.

Despite the statwide workforce reduction, plaintiffs both retained their jobs as correctional officers and were given the new posts they requested, based on their seniority. Although plaintiffs were asked at deposition if they considered the mailroom post to be a "better" job than certain other posts, the Supreme Court has emphasized that the adverse action inquiry is an objective one. <u>Burlington N. &</u>

27

**Santa Fe Ry. Co. v. White**, 548 U.S. 53, 68–69 (2006) ("it is important to separate significant from trivial harms"). Plaintiffs merely responded that they considered the mail room to be a "better job" because "it's air conditioned" and "you have comfortable chairs to sit in" (Triplett Dep. at 113, Messer Dep. at 72). In any event, Messer acknowledges that she also sat in a chair in her new post in K Block. To be an adverse action, the change in employment terms or conditions must be more than a "mere inconvenience or an alteration of job responsibilities." **Hollins v. Atlantic Co.**, 188 F.3d 652, 662 (6th Cir. 1999). Plaintiffs' "subjective impressions as to the desirability of one position over another" are not controlling. **Kocsis**, 97 F.3d at 886; **Mitchell v. Vanderbilt Univ.**, 389 F.3d 177, 183 (6th Cir. 2004) (a person's "subjective impression concerning the desirability of one position over another is insufficient to render an employer's action materially adverse"). The Court notes that even within the mailroom post, plaintiffs complained they did not like having to do the prisoner's "legal" mail and resented it whenever the previous shift left such work for them to do (Messer Dep. at 73-74 "nobody likes to do that job"). Plaintiffs have not shown that their reassignment to posts of their choice was an "adverse action."

Plaintiffs attempt to meet the prima facie requirement of an "adverse action" by characterizing Triplett's voluntary disability retirement and Messer's resignation as "constructive discharges." See **Logan v. Denny's, Inc.**, 259 F.3d 558, 568 (6th Cir. 2001) (a constructive discharge may be an adverse action). A constructive discharge occurs when "working conditions would have been so

difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." <u>Kocsis</u>, 97 F.3d at 887 (quoting <u>Held v. Gulf Oil Co.</u>, 684 F.2d 427, 432 (6th Cir. 1982)). Plaintiffs have not shown that their employer "deliberately created intolerable working conditions, as perceived by a reasonable person," with the intention of forcing them to quit. <u>Logan</u>, 259 F.3d at 568–69. Although the plaintiffs had complained about their previous mailroom supervisor and co-workers Kraft and Ferguson, their employer reassigned the supervisor, promptly addressed the plaintiffs' grievances (most of which were withdrawn), and subsequently granted the plaintiffs' requests for reassignment to new posts where they did not work with Kraft and Ferguson. Plaintiffs have not made any showing that their employer deliberately created "intolerable working conditions" with the intention of "forcing" them to quit.

After working at her K Block post since May 2010, Triplett requested and was approved for a voluntary disability retirement in August 2011. Voluntarily retiring with benefits is not an "adverse action." The ODRC's letter granting Triplett's request specifically reminds her that "a voluntary disability separation is <u>not</u> a disciplinary action" (doc. no. 25-18 at 11). As for Messer, an employee who voluntarily resigns is not entitled to protection against an allegedly "discriminatory discharge." The plaintiffs simply made a personal decision to voluntarily retire or resign. Their conclusory allegation that they felt "forced" to do so does not create any genuine issue of material fact. Plaintiffs have not pointed to any evidence that they were demoted, that their pay or job responsibilities were

reduced, that they were reassigned to work under a younger and/or male supervisor, or that they were offered continued employment on less favorable terms. See <u>Logan</u>, 259 F.3d at 569 (discussing relevant factors). Other than their own subjective allegations, plaintiffs point to no evidence suggesting that their working conditions were so difficult or unpleasant that a reasonable person in their shoes would have felt compelled to resign, nor have they shown that their employer's actions were intended to force them to do so. <u>Kocsis</u>, 97 F.3d at 887 ("[t]here is simply nothing on this record to show that the defendant constructively discharged the plaintiff"). The Court agrees with the Magistrate Judge's recommendation that, at the second step of the prima facie case, plaintiffs have not shown any "adverse employment action."

Plaintiffs' age and sex discrimination claims would also fail at the fourth step because they have not offered any evidence that they were "replaced" by someone substantially younger and/or male or "treated differently" than younger and/or male officers. Although Messer alleges that she was "replaced" after the west desk post was eliminated in the workforce reduction, defendants point out (doc. no. 43 at 7) that her allegation is not based on any rosters or other employment documentation from SOCF, but rather, only on inadmissible hearsay statements of unidentified coworkers. Messer testified that she would call SOCF to ask who was working in the visiting room (Messer Dep. at 253, Q: Who were you asking? A: Just different people). Based on this, she sent a letter on February 1, 2010 to the ODRC Director alleging that on twelve occasions, certain officers

worked in the visiting room at her former post although such post had been abolished (Messer Dep. Ex. 36). Capt. William Cool reviewed SOCF records and informed Messer that her allegations were factually inaccurate (doc. no. 23-46, Letter of Feb. 19, 2010). Messer's grievance was denied (Messer Dep. 244-246). Messer has not provided any admissible evidence to substantiate her belief that she was "replaced" by younger/male officers. Review of Messer's letter also reflects that it relates more to overtime and job abolishment issues, than to any allegations that "younger and/or male" officers had replaced her.

As the Magistrate Judge observed (doc. no. 52 at 11), plaintiffs attempt to rely on Messer's own allegations in her grievance to show that "male temporary officers" were assigned to work Messer's post after it was abolished. Defendants point to Capt. William Cool's response indicating that his investigation and SOCF work logs showed that Messer was mistaken, and that no inappropriate assignment of male correctional officers occurred. At the fourth step of the prima facie case, plaintiffs have not shown that they were "replaced."

Plaintiffs have also not pointed to evidence that they were "treated differently" than younger and/or male officers. This step is inherently contextual and generally requires that the plaintiffs and any comparative employees "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct." Perry v. McGinnis, 209 F.3d 597, 601 (6th Cir. 2000) ("the comparative employees offered by plaintiff must be similarly-situated in all relevant respects"). Plaintiffs have not made such showing. For example,

31

Messer complains that she was counseled for accepting a "collect" telephone call of excessive length (62 minutes) on a work phone during working hours (Messer Dep. at 133). Although she argues in conclusory fashion that she was "harassed and discriminated against" due to this corrective counseling (doc. no. 38-2 at 2), she points to no evidence that any other employee made a phone call of comparable length and was not counseled. Despite her belief that she "didn't do nothing wrong" (Messer Dep. at 134), she was supposed to be watching prisoners and visitors instead of talking on the phone with a friend for over an hour. She was appropriately counseled for violating SOCF's written policy for telephone use (doc. no. 38-3 at 1-7). Defendants aptly point out that this is not evidence of "disparate treatment" or "harassment."

As for Triplett, she complains that she was "correctively counseled" after admittedly violating SOCF's call-off procedures (Triplett Dep. 84-87, 246-247, Ex. 50; Miller Dep. 22-24). Defendants point out that Triplett has not provided the names, gender, or age of any similarly situated individual who did not receive discipline for failing to follow proper call-off procedures (doc. no. 43 at 8). See, e.g., Weatherby v. Federal Exp., 454 Fed.Appx. 480, 488 (6th Cir. (Tenn.) 2012), cert. denied, 133 S.Ct. 896 (2013), r'hrg denied,133 S.Ct. 1749 (2013) (affirming summary judgment because plaintiff did not show she was treated differently than similarly situated male employees). Plaintiffs present no evidence that other correctional officers were not being disciplined for similar infractions, nor do plaintiffs point to any evidence suggesting that their (non-disciplinary) "counseling" for admitted

infractions was unwarranted. Although Triplett points to a hand-written note by CO Ralph Merritt (Aff. at ¶ 62, Ex. B-10) as purported evidence that he "used the same procedure as I did on several occasions without discipline or counseling," CO Merritt merely indicates that another officer might finish the call-in paperwork if the supervisor was in the restroom or other circumstances not applicable here.

To the extent plaintiffs contend that they were "being made to work" and that other officers were goofing off, plaintiffs do not point to any evidence to support their subjective belief, much less that any purported workplace slights had anything to do with age or sex discrimination (Messer Dep. at 81, Q: How was Officer Kraft treated differently than you? A. I was made to work and he wasn't.). Although plaintiffs had complained to Lt. Miller that CO Ferguson was sleeping on the job and that CO Kraft was not doing his work, Lt. Miller indicated he promptly observed Ferguson and Kraft at work over the next few weeks, but found nothing to substantiate the plaintiffs' complaints about their co-workers (Miller Dep. at 32-37 "they just acted appropriately and did their job").

Although Messer complained at deposition that other officers had "shoved baskets of mail" at them to do when she and Triplett worked in the mailroom, she acknowledged that she didn't know if they were giving more work to anyone else (Messer Dep. at 14, 46). With respect to the prisoner legal mail, Messer contends that other officers "would try to pawn that off on somebody every Monday, because the officers that's assigned to that evidently didn't want to do it, or he knew he could get somebody else -- one of us to do it." (Id. at 37-38). Messer

alleges that "they started dumping all the workload on her and me and whoever else was in there" (Id. at 25). While plaintiffs may have resented this, they point to nothing suggesting that any of this was due to their sex or age.

When asked how Ferguson was treated differently than her, Messer vaguely indicated that she had complained that "he wouldn't put his alarm on," but she acknowledged that she was unaware of whether he had been counseled (Messer Dep. at 69 "not that I was aware, not unless they did get him back somewhere and talk to him. I don't know. I don't know the outcome of anything"). Although Messer complains that she "got talked to because I happened to be off my desk," she acknowledges that "according to our post orders, it stated I wasn't allowed to leave my desk" (Messer Dep. at 82-83). Lt. Miller indicates that "I did tell them on several occasions that they weren't both supposed to be at the podium or both at the desk, because that reduced their ability to observe the visitors" (Miller Dep. at 63, Q. And did you tell the men that, also? A. Yes, I did.). Plaintiffs' unsupported allegation is not evidence of disparate treatment based on sex or age.

Although Messer vaguely complains that she was treated "differently" because CO Bennet "could get more attention on something that was happening or not happening than I could," this is not evidence of sex discrimination for the simple reason that CO Bennet is female (Messer Dep. at at 67). Her allegation of preferential treatment is also quite vague and based on hearsay (Messer Dep. at 268, Q. How do you know that Bennett and Ferguson got vacation days? A. Somebody told me. I don't know who told me, but somebody told me that.).

In short, the plaintiffs' argument that they were "treated differently" is not supported by objective evidence. To survive summary judgment, it is plaintiff's burden to "present affirmative evidence." <u>Anderson</u>, 477 U.S. at 257; <u>White</u>, 533 F.3d at 389 (the "non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial."). While plaintiffs may sincerely believe that they were subject to disparate treatment due to their age or sex, such belief is insufficient to create a genuine dispute of material fact. <u>Lewis v. Philip Morris Inc.</u>, 355 F.3d 515, 533 (6th Cir. 2004) (plaintiffs must "show sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation"), cert. denied, 543 U.S. 821 (2004). Plaintiffs have not established a prima facie case of sex or age discrimination based on disparate treatment.

### 3. Hostile Working Environment Theory

Plaintiffs also proceed on a theory of "hostile work environment" based on their sex and/or age. See, e.g., <u>Francis v. Davis H. Elliot Const. Co., Inc.</u>, 2013 WL 3456740, *2 (S.D.Ohio) (explaining that even if an employee was not treated less favorably than similarly situated employees in connection with an adverse employment action, the employee may still have been subject to a hostile work environment).

To establish such a claim, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment." <u>Harris v. Forklift Sys., Inc</u>., 510 U.S. 17, 21 (1993). Plaintiffs must show that the defendants' conduct was objectively "severe or pervasive" enough to create a work environment that any reasonable person would find hostile or abusive, and plaintiffs also must have subjectively regarded the environment as abusive. <u>Bowman v. Shawnee State Univ</u>., 220 F.3d 456, 463-64 (6th Cir. 2000); <u>Barrett v. Whirlpool Corp</u>., 556 F.3d 502, 514 (6th Cir. 2009). "Whether an environment is hostile or abusive can be determined only by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 at 21. "Isolated incidents, unless extremely serious, are not sufficient to support a hostile work environment claim." <u>Morris v. Oldham Cty. Fiscal Ct.</u>, 201 F.3d 784, 790 (6th Cir. 2000). The Supreme Court has repeatedly emphasized that Title VII is not a "general civility code." <u>Farragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).

After a thorough analysis, the Magistrate Judge recommended that the plaintiffs have not shown that the defendants' conduct was "severe or pervasive" enough to create a hostile work environment. The Court agrees. Even giving plaintiffs the benefit of all reasonable inferences, they have not shown that a reasonable person would share their subjective interpretation that the actions of their co-workers and supervisors amounted to a hostile work environment. Defendants point out that the plaintiffs did not report many of the incidents they

36

now complain about, and that when plaintiffs did complain, their employer promptly investigated and responded appropriately. For example, although Triplett contends that their relief duties on Mondays were assigned in a discriminatory manner, she admits she never raised such issue to her employer:

> Q. Did you ever file a grievance about the way those jobs were assigned?
> A. No, I don't think so. I don't recall.
> Q. Did you ever write a DRC 1000 about it?
> A. Don't recall.
> Q. Did you ever talk to any of the supervisors about the way those jobs were assigned?
> A. I don't recall. (Triplett Dep. at 115-116).

The incidents that plaintiffs reported were not frequent, nor severe in nature. Harris, 510 at 21. Often, the plaintiffs mischaracterize events as "harassment." They are not entitled to unreasonable inferences based on conclusory allegations or a mischaracterization of the evidence. Plaintiffs' generalized allegation that they were called "snakes, cows, and bitches" is a good example of an allegation that does not hold up under examination of the evidence. Given that the record reflects only a few isolated and indirect references, such allegation is exaggerated. Other incidents, such as the temporary removal of the desk and the camera monitoring, are isolated and petty. See, e.g., Moore v. Pielech, 2012 WL 4482991, *13 (S.D.Ohio) (granting summary judgment because the incidents plaintiffs complained of, such as being "monitored" by his employer and having his desk moved to a location he disliked, were not severe of pervasive). "Conduct that is not severe or pervasive enough . . . is beyond Title VII's purview." Harris, 510 U.S. at 21-22.

The Magistrate Judge observed (doc. no. 52 at 20) that the plaintiffs make vague allegations about personal safety in their affidavits (Triplett Aff. ¶ 21(7); Messer Aff. ¶ 21(7). At deposition, Messer admitted that she was never physically threatened (Messer Dep. at 197, Q. Did any of your co-workers ever threaten your physical safety? A. No, not to my face, no, not that I'm aware of. Q. Did any of your supervisors ever threaten your physical safety? A. No.). When asked to identify any alleged threats, Triplett merely characterized CO Kraft's behavior when he was "laughing and giggling" as "intimidating" (Triplett Dep. at 195). Although they complain that Kraft occasionally acted "goofy," slammed doors, or stared, such incidents were not objectively severe or pervasive enough to create a work environment that any reasonable person would find hostile or abusive.[14]

To the extent plaintiffs allege that Lt. Miller created a hostile work environment, the parties argue in their supplemental briefs about whether he was a "supervisor" for purposes of the United States Supreme Court's recent decision in Vance v. Ball State Univ., 133 S.Ct. 2434 (2013). In Vance, the Supreme Court held that an individual is a "supervisor" for purposes of vicarious liability under Title VII if he is empowered by the employer to take tangible employment actions against the victim. Id.; Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998) ("A tangible employment action in most cases inflicts direct economic harm."). Defendants point out that Lt. Miller did not have authority to hire, fire, demote, or

---

[14] Plaintiffs reported Kraft's "goofy" behavior, but Capt. Bell could not substantiate the allegation because there were no cameras on the area at the time (Triplett Dep. at 38).

otherwise inflict "direct economic harm" on plaintiffs (doc. no. 61 at 2-3). Under Ohio law, the warden is the appointing authority for a correctional institution and has the "authority to appoint, select, promote, transfer, reinstate, reduce, discipline and remove employees of the department" OAC § 5120-7-01(A). Defendants assert that Lt. Miller was three managerial levels below warden and therefore SOCF/ODRC could be liable only if it was negligent in controlling the plaintiffs' working conditions.

Defendants point out in their reply that evidence consisting of only a single e-mail, being viewed on the area's surveillance camera several times (after complaining about co-workers in the same area), a satisfactory performance evaluation, and a sign that only one of the plaintiffs saw (and which was immediately taken down by the supervisor when called to his attention) does not create the "severe and pervasive" atmosphere necessary to establish a hostile work environment. <u>Faragher</u>, 524 U.S. at 787; <u>Harris</u>, 510 U.S. at 21-223; <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998). Even giving plaintiffs the benefit of all reasonable inferences, they have not shown a hostile work environment due to gender or age bias. Plaintiffs' objections merely repeat their prior arguments (doc. no. 56 at 7-14).

Although plaintiffs attempt to blame Lt. Miller for a "hostile work environment," the Magistrate Judge correctly pointed out (doc. no. 52 at 10) that both plaintiffs were insubordinate to Lt. Miller on multiple occasions. Prior to requesting reassignment to another shift, Lt. Miller gave Messer an order, but she

responded that she would not speak to him without first talking to her lawyer. After Lt. Miller moved to the CC1 post, Triplett admittedly telephoned his office 4-5 times on Mondays to receive her job assignment, but would refuse to speak with him and hang up (Triplett Dep. at 60-61). Lt. Miller wrote up Triplett once for admittedly not following call-in procedures. Although she claims she was "harassed" by being "counseled" for admittedly violating procedures, Triplett points to no evidence suggesting that this had anything to do with her age or sex.

The plaintiffs' subjective view of what constitutes "harassment" is not controlling here. For example, Messer indicates she left her post without permission and without telling anyone where she was going, but bristles when Lt. Miller, as supervisor, asks her about it (Messer Dep. at 178-79 "he starts asking me where I'd been, who relieved me off my post, who said I could leave my post, and blah, blah, blah, all this stuff. I don't remember. . . . And I told him, you know, I know -- no, I didn't have permission to leave my post, you know. I didn't have permission. I admit that."). A supervisor's legitimate query about an officer's absence from her assigned post is not evidence of "harassment" or a "hostile work environment." In any event, she was not disciplined for leaving her post or for insubordination. Defendants point out that Lt. Miller was not the subject of any of plaintiffs' grievances until June 17, 2009, and that the SOCF reacted promptly and appropriately (doc. no. 59 at 7-8). The investigation and response were reasonable under all the circumstances. The record does not reflect that the SOCF was "indifferent" to plaintiffs' complaints. When plaintiffs made complaints, no

matter how baseless, the SOCF reacted appropriately to investigate and respond.

With respect to alleged coworker harassment, plaintiffs point to no evidence suggesting that their employer tolerated sexual harassment or did not take it seriously. Lt. Miller's response to the "cooterz" sign was prompt and appropriate. SOCF had written policies expressly prohibiting workplace sexual harassment, and no evidence suggests any attitude of permissiveness on its part. SOCF exercised reasonable care to prevent and correct any harassing behavior. See, Russell v. Univ. of Toledo, 537 F.3d 596, 607 (6th Cir. 2008).

The Magistrate Judge gave a very generous reading to the minimal evidence of gender-based harassment and found no evidence at all of any age-based animus (doc. no. 52 at 25). As already discussed, plaintiffs have pointed to little or no evidence of harassment based on their sex or age, much less that it unreasonably interfered with their work performance and created a hostile work environment.[15] Plaintiffs have not shown that their employer knew or should have known of any alleged harassment and failed to take prompt and appropriate corrective action. Williams v. General Motors Corp., 187 F.3d 553, 560–61 (6th Cir. 1999). The record reflects that their employer responded promptly to their grievances, which were often withdrawn or settled, or otherwise determined to be unfounded. Whenever one of their complaints arguably alleged "hostile work environment," the SOCF temporarily and appropriately reassigned plaintiffs to a

---

[15] Triplett indicated in her exit survey that she "strongly agreed" that "overall, I had good working relationships with most of my co-workers" (doc. no. 25-18 at 7).

different post while investigating (Triplett Dep. at 43-44). See, e.g., <u>Rudd v. Shelby Cty., Tenn.</u>, 166 Fed.Appx. 777 (6th Cir. 2006), cert. denied, 549 U.S. 823 (2006). Plaintiffs have failed to make out a prima facie discrimination claim based on hostile work environment.

<u>Retaliation Claims</u>

In their objections, plaintiffs assert that they have established a prima facie case of retaliation (doc. no. 56 at 14). To establish a claim of retaliation, each plaintiff must show that: (1) she engaged in a protected activity; (2) her employer knew of her exercise of protected rights; (3) she was the subject of an adverse employment action; and (4) there was a causal link between the protected activity and the adverse employment action. <u>Wasek v. Arrow Energy Services, Inc</u>., 682 F.3d 463, 469 (6th Cir. 2012). The Magistrate Judge recommended that plaintiffs failed to show they suffered any adverse employment actions (doc. no. 52 at 38-45). The Court agrees.

Although plaintiffs complain that they were pulled from their posts and moved to another duty station in "retaliation" for alleging hostile work environment in the Visiting/Mailroom Area, their removal during a pending investigation of their complaints was appropriate (Triplett Dep. at 43-44, acknowledging this). The warden removed them from the visiting/mailroom area on June 18, 2009 for approximately one week while their complaint was promptly investigated. See, e.g., <u>Rudd</u>, 166 Fed.Appx. at 779 (finding that the county acted appropriately to safeguard Rudd because upon receiving her complaint of sexual

42

harassment, the county promptly moved her to work in a different area, away from the alleged harassment).

To the extent plaintiffs complain that they were "disciplined" in retaliation for raising previous complaints of discrimination, the record reflects that no discipline was ever imposed on them. Corrective counseling is not considered discipline (Triplett Dep. at 86, 145 "I know corrective counseling is not discipline"). Messer admitted violating the policy against telephone calls of inappropriate length. The filing of a grievance or charge does not insulate an employee from the consequences of their own misbehavior. Plaintiffs have not proffered evidence that would be sufficient to raise any inference that their protected activity was the likely reason for any alleged adverse actions. See Allen v. Mich. Dept. of Corrections, 165 F.3d 405, 413 (6th Cir. 1999).

Even assuming a prima facie case, ODRC's decision to eliminate 12 positions at SOCF, including Messer's post, in a state-wide workforce reduction was a legitimate business decision. Plaintiffs have not shown that this was merely a pretext for sex or age discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) ("a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason"); Chen v. Dow Chemical Co., 580 F.3d 394, 400 (6th Cir. 2009) ("at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination").

Plaintiffs make much of the purported timing of the posting of the ODRC's

43

staff reduction proposals and contend that the suggestion in "Proposal F" to combine the west desk and shakedown officer position is evidence of "retaliation." Triplett does not point to any evidence that this proposal was generated after (or as a result of) her visit to the local OCRC office that same day. This proposal was later revised to eliminate Messer's post. Although Messer speculates that this may have been in retaliation for an earlier charge in May 2009 (doc. no. 37-2 at 3), the ODRC Regional Director explained to Messer by letter that management and labor could not agree on any of the final proposals; all of which went through the statewide Pick-a-Post Oversight Committee, and ultimately to arbitration" (doc. no. 37-2 at 9). Notably, at deposition, plaintiffs inconsistently blamed their union for the loss of this post. The Court agrees with the defendants' assertion (doc. no. 59 at 12) that mere temporal proximity is insufficient to show pretext here.

Accordingly, the Court will **OVERRULE** the plaintiffs' objections; **AFFIRM** the Magistrate Judge's Report and Recommendation (doc. no. 52); and **GRANT** the defendants' "Motion for Summary Judgment" (doc. no. 31). This case is DISMISSED and TERMINATED on the docket of this Court.

IT IS SO ORDERED.

                              s/Herman J. Weber
                    **Herman J. Weber, Senior Judge**
                    **United States District Court**

44